# United States Court of Appeals
## For the First Circuit

---

No. 04-2154

UNITED STATES OF AMERICA,

Appellee,

v.

EDWARD COKER,

Defendant, Appellant.

---

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. George A. O'Toole, Jr., U.S. District Judge]

---

Before

Torruella, Circuit Judge,
Cyr, Senior Circuit Judge,
and Howard, Circuit Judge.

---

James H. Budreau, for appellant.

William H. Connolly, Assistant United States Attorney, with whom Michael J. Sullivan, United States Attorney, was on brief, for appellee.

---

December 28, 2005

---

**TORRUELLA, Circuit Judge.** Defendant-appellant Edward Coker was convicted by a jury of one count of attempted arson in violation of 18 U.S.C. § 844(i). He now appeals, arguing that the district court erred in denying his motion to suppress a confession he made to federal agents because the agents violated his Sixth Amendment right to counsel. We affirm.

## I. Background

In the early morning hours of July 28, 2002, a fire broke out inside an apartment building located at 43 High Rock Street in Lynn, Massachusetts. Police officers and firefighters arriving at the scene found that a glass panel on the front door of the apartment building had been shattered. After firefighters extinguished the fire, the officers determined that three small fires had been set inside the building. They also found what appeared to be a Molotov cocktail in the hallway of the third floor of the building. The officers interviewed residents of the building, two of whom stated that they had seen a black male, who had been driving a Nissan sports car with a T-roof,[1] standing on the sidewalk outside the building yelling up at an apartment on the third floor. This man entered and exited the building just before the residents noticed the smell of smoke. One of the witnesses saw

[1] According to Wikipedia, a free-content online encyclopedia, T-roofs "open a vehicle roof to the side windows, providing a wider opening than other sunroofs. [They] have two removable glass panels, and leave a T-shaped structural brace in the roof center." http://en.wikipedia.org/wiki/Sunroof (last visited Oct. 27, 2005).

a straw hat in the man's car, while the other observed the man carrying a baseball bat.[2]

Based on these statements, police issued a "be-on-the-lookout" ("BOLO") call for a man fitting the witnesses' description. Shortly thereafter, two officers responding to an unrelated noise disturbance complaint a short distance from High Rock Street saw Coker sitting in a Nissan sports car that matched the description in the BOLO. The officers approached the car and saw a straw hat and silver baseball bat in the front seat.[3] The officers later found a pair of rubber gloves and a butane lighter in the center console.

The officers detained Coker and arranged for a "show-up" identification, meaning that they arranged for the two witnesses to be brought to Coker's location and tell the police whether he was the man they had seen. Both witnesses identified Coker as the man they had seen yelling and entering the building just before the fire started. Coker was then placed under arrest.

Coker was booked at the Lynn Police Department and charged with burning or aiding in the burning of a dwelling house, in violation of Mass. Gen. Laws ch. 266, § 1, and malicious or

---

[2] We discuss exactly what the witnesses saw and heard in more detail in Part II.B., infra.

[3] The baseball bat had pieces of glass embedded in it. These pieces of glass were later matched to the glass from the shattered door panel at 43 High Rock Street.

wanton injuries to personal property, in violation of Mass. Gen. Laws ch. 266, § 127. On July 31, 2002, Coker was arraigned in state district court, had an attorney appointed, and was released on personal recognizance.

Between July 28 and July 31, the Lynn Fire Department notified the Bureau of Alcohol, Tobacco, and Firearms ("BATF") of the incident because it had found what appeared to be a Molotov cocktail in the apartment building.[4] BATF Agent Konstantinos Balos ("Agent Balos") began an investigation to determine if the incident involved a federal crime. See 18 U.S.C. § 844. Agent Balos interviewed a number of witnesses to the alleged arson. Several Lynn police officers were present at these interviews. On August 8, 2002, Agent Balos and another BATF agent went to Coker's house and asked him to consent to an interview. At this time, Agent Balos knew that Coker was represented by counsel in the state case. Coker agreed to the interview and, driving his own car, followed the agents to the Lynn Fire Department, where the BATF maintains a satellite office. The agents brought Coker into a room, gave him a seat nearest an unlocked door, told him that he was not under arrest and was free to leave at any time, but nevertheless read Coker his Miranda rights, and gave him a copy of those rights. During the interview, which lasted around ninety

[4] The device was submitted to a federal forensics laboratory and eventually determined to be a fake.

minutes, Coker confessed to setting fire to the High Rock Street apartment building.[5] Towards the end of the interview, Coker became emotional, stating that he regretted setting the fire and felt like killing himself. Coker told the agents that he wanted to end the interview and left the station.

In April 2003, a federal grand jury indicted Coker, charging him with one count of attempted arson in violation of 18 U.S.C. § 844(i). Coker filed a motion to suppress the confession, arguing that the federal agents had violated his Sixth Amendment right to counsel. The district court denied the motion to suppress. On May 9, 2004, following a three-day jury trial, Coker was convicted. He was sentenced to 60 months' imprisonment. He now appeals, arguing that the district court erred in denying his motion to suppress.

## II. Discussion

### A. Sixth Amendment Right to Counsel

We use a bifurcated standard in reviewing a district court's ruling on a motion to suppress, reviewing factual rulings for clear error and legal rulings de novo. United States v. Pardue, 385 F.3d 101, 104 (1st Cir. 2004).

---

[5] Evidently, Coker had offered a resident of the building, Edith Drame, $40 for a bag of marijuana. Drame said she could get him the marijuana, took the money, and entered her apartment with no intention of coming back out. It was Drame's apartment that Coker was yelling at when the two witnesses saw him.

Under the Sixth Amendment, "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence." U.S. Const. amend. VI. This right to counsel "does not attach until a prosecution is commenced, that is, at or after the initiation of adversary judicial criminal proceedings -- whether by way of formal charge, preliminary hearing, indictment, information, or arraignment." McNeil v. Wisconsin, 501 U.S. 171, 175 (1991) (internal quotation marks and citation omitted). The Supreme Court has held that "if police initiate interrogation after a defendant's assertion, at an arraignment or similar proceeding, of his right to counsel, any waiver of the defendant's right to counsel for that police-initiated interrogation is invalid." Michigan v. Jackson, 475 U.S. 625, 636 (1986).

In the instant case, we agree with the district court that "there is no dispute[] that Coker's Sixth Amendment right to counsel had attached as to the state charges at least by July 31, 2002, the date of his arraignment in state court, and that he did not validly waive that right before" his confession to the BATF agents. United States v. Coker, 298 F. Supp. 2d 184, 189 (D. Mass. 2003). Thus, there is no dispute that Coker's confession would not have been admissible in the state prosecution.

The Supreme Court has stated that "[t]he Sixth Amendment right [to counsel] . . . is offense specific. It cannot be invoked

once for all future prosecutions." McNeil, 501 U.S. at 175. The issue currently before us is whether the uncharged federal arson offense was the same offense as the state arson offense for Sixth Amendment purposes when Coker confessed to the BATF agents. As Coker notes, both offenses involved the same essential elements of proof. If the two offenses were the same, then Coker's Sixth Amendment right to counsel had attached to the federal offense and was violated when the federal agents interviewed him.

Our resolution of this issue turns on our interpretation of Texas v. Cobb, 532 U.S. 162 (2001), in which the Supreme Court clarified the meaning of "offense" in the Sixth Amendment context. In Cobb, the defendant confessed to a home burglary but denied knowledge of the simultaneous disappearances of a woman and child from the burglarized home. Id. at 165. He was indicted for the burglary, had an attorney appointed, and was released on bond. Id. Over a year later, while the burglary charges were still pending, the defendant confessed to his father that he had killed the woman and her child. Id. His father informed the police, who arrested the defendant and advised him of his Miranda rights. Id. The defendant waived these rights, confessed to the murders, and was eventually convicted of capital murder. Id. at 165-66. The Texas Court of Criminal Appeals reversed the conviction, finding that "the Sixth Amendment's right to counsel had attached on the capital murder charge even though [the defendant] had not yet been charged

with that offense" because the murder charge was "factually interwoven with the burglary." Id. at 166 (internal quotation marks omitted).[6] The court found that the defendant had asserted his Sixth Amendment right to counsel by accepting appointment of counsel in the burglary case, and therefore deemed the confession inadmissible. Id.

The Supreme Court reversed, rejecting the "factually related" exception to the offense-specific rule. Id. at 172-73. The Court re-emphasized that the Sixth Amendment is offense-specific and looked to its Fifth Amendment double jeopardy jurisprudence to define the term "offense" in the Sixth Amendment context. Id. The Court applied a test it had articulated in the double jeopardy context in Blockburger v. United States, 284 U.S. 299, 304 (1932): "where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not." Cobb, 532 U.S. at 173 (internal quotation marks and citation omitted). The burglary and murder charges were separate offenses under the Blockburger test. The Court thus found that the defendant's Sixth Amendment right to counsel had not attached to the murder charge. Id.

[6] Following McNeil, some courts "read into McNeil's offense-specific definition an exception for crimes that are 'factually related' to a charged offense." Cobb, 532 U.S. at 168.

In the instant case, the state and federal arson charges contained the same essential elements. Thus, one might conclude that, under Cobb and Blockburger, Coker's federal and state offenses were the same for Sixth Amendment right to counsel purposes. However, of significant importance to the present case is the fact that the Court in Cobb stated that "[w]e see no constitutional difference between the meaning of the term 'offense' in the contexts of double jeopardy and of the right to counsel." Id. In its double jeopardy jurisprudence, the Court has held that a defendant's conduct in violation of two separate sovereigns ("the dual sovereignty doctrine") constitutes two distinct offenses. See, e.g., Heath v. Alabama, 474 U.S. 82, 87-93 (1985). Thus, under the dual sovereignty doctrine, Coker's federal offense would be considered separate from his state offense for double jeopardy purposes.[7]

The question thus becomes whether the Court in Cobb incorporated all of its double jeopardy jurisprudence (including the dual sovereignty doctrine) or merely the Blockburger test into its Sixth Amendment right to counsel jurisprudence. The Second Circuit has held that the Court incorporated only the Blockburger test into its Sixth Amendment jurisprudence and that the dual sovereignty doctrine does not apply in the Sixth Amendment context.

---

[7] There is an exception to the dual sovereignty doctrine that we discuss below.

See United States v. Mills, 412 F.3d 325 (2d Cir. 2005). In Mills, an information issued charging the defendant with multiple state firearms violations. Id. at 327. After the information had issued, local police officers interviewed the defendant without counsel present. Id. The parties did not dispute that this interview violated the defendant's Sixth Amendment right to counsel as to any subsequent state prosecution. Id. at 328. However, the federal government attempted to use Mills's statements to the local police in a subsequent federal prosecution for an offense with same elements as the state offense. Id. The Second Circuit held that, because the two offenses were the same under the Blockburger test, Mills's statements were inadmissible in the federal prosecution. Id. at 330. The court rejected the government's argument that, under Cobb, the doctrine of dual sovereignty applied in the Sixth Amendment context. Id. ("The fact that Cobb appropriates the Blockburger test, applied initially in the double jeopardy context, does not demonstrate that Cobb incorporates the dual sovereignty doctrine."). Coker argues that we should follow the Second Circuit's rationale.

The Fifth Circuit, along with the district court in the instant case, has taken the position that the dual sovereignty doctrine should be applied in the Sixth Amendment context. See United States v. Avants, 278 F.3d 510 (5th Cir. 2002). In Avants, the defendant was indicted in 1967 on Mississippi state murder

charges related to the killing of African-American sharecropper named Ben White. Id. at 513. He was provided with counsel and released on bond. Id. While out on bond, the defendant was interviewed without counsel by FBI agents who were investigating a separate murder. Id. During the interview, the defendant confessed to killing White. Id. The FBI agents did not follow up on the confession because they were not investigating White's murder. Id. at 513-14. The defendant was later acquitted of the state murder charges. Id. at 514. In June 2000, the defendant was indicted for the murder by a federal grand jury and moved to suppress the confession he had made to the FBI agents. Id. The Fifth Circuit held that "the Supreme Court [in Cobb] has incorporated double jeopardy analysis, including the dual sovereignty doctrine, into its Sixth Amendment jurisprudence." Id. at 517. It therefore found that the defendant's uncounseled confession to federal agents was admissible in the federal trial. Id. at 522. The government argues that we should follow the Fifth Circuit's rationale.

After carefully examining Cobb, we conclude that the dual sovereignty doctrine applies for the purposes of defining what constitutes the same offense in the Sixth Amendment right to counsel context. In doing so, we reject the reasoning of the Second Circuit in Mills and adopt the reasoning of the Fifth Circuit in Avants. The court in Mills stated that "[n]owhere in

Cobb, either explicitly or by imputation, is there support for a dual sovereignty exception" in the Sixth Amendment right to counsel context. Mills, 412 F.3d at 330. This statement, in our view, does not give adequate consideration to the Court's statement that it saw "no constitutional difference between the meaning of the term 'offense' in the contexts of double jeopardy and of the right to counsel." Cobb, 532 U.S. at 173. If the Court intended to incorporate only the Blockburger test into its Sixth Amendment jurisprudence, then its statement in Cobb would make no sense, as there would be a difference in the meaning of the term "offense" in the contexts of double jeopardy and of the right to counsel.[8]

This conclusion is bolstered by a footnote in Cobb, in which the Court stated that "we could just as easily describe the Sixth Amendment as 'prosecution specific,' insofar as it prevents discussion of charged offenses as well as offenses that, under Blockburger, could not be the subject of a later prosecution." Id. at 173 n.3. While the Court referenced only Blockburger, the statement indicates that the Court was referring to Blockburger in the context of its general double jeopardy jurisprudence. In other words, we understand the Court to have meant that if the government could not prosecute a defendant for an offense due to double

[8] The difference, of course, would be that offenses with the same essential elements under the laws of two separate sovereigns would not constitute the "same offense" for double jeopardy purposes, while they would constitute the "same offense" for right to counsel purposes.

jeopardy principles, then it could not question the defendant about that offense without implicating his Sixth Amendment right to counsel, even if the defendant had not yet been charged with the offense. In this case, double jeopardy principles would not have prevented the federal government from prosecuting Coker because of the dual sovereignty doctrine.[9] Therefore, because Coker was properly subject to a later federal prosecution, it follows from the Court's statement that the Sixth Amendment did not prevent discussion of the uncharged federal offense.

Coker argues that applying the dual sovereignty doctrine to cases such as his will permit law enforcement to perform an end run around a defendant's Sixth Amendment right to counsel. As the government notes, a similar argument was raised in Cobb and rejected by a majority of the Supreme Court. The defendant in Cobb had argued that applying the offense-specific rule in the Sixth Amendment right to counsel context "will prove disastrous to suspects' constitutional rights and will permit law enforcement officers almost complete and total license to conduct unwanted and uncounseled interrogations." Cobb, 532 U.S. at 171 (internal quotation marks omitted). In rejecting this argument, the Court

---

[9] In this sense, the dual sovereignty doctrine serves as an exception to the Blockburger test. Given the Court's statement in Cobb that it saw no difference between the term "offense" in the double jeopardy and right to counsel contexts, we see no reason why the dual sovereignty doctrine would not serve as an exception to the Blockburger test in the right to counsel context.

emphasized that it failed adequately to appreciate two considerations:

> First, there can be no doubt that a suspect must be apprised of his rights against compulsory self-incrimination and to consult with an attorney before authorities may conduct custodial interrogation . . . Second, it is critical to recognize that the Constitution does not negate society's interest in the ability of police to talk to witnesses and suspects, even those who have been charged with other offenses.

Id. at 171-72. These considerations apply with equal force to the instant case, especially given the fact that Coker was given and waived his Miranda rights. See id. at 172 n.2 ("Even though the Sixth Amendment right to counsel has not attached to uncharged offenses, defendants retain the ability under Miranda to refuse any police questioning . . . ."). Further, any concerns we may have about potential "end runs" around the Sixth Amendment's protections are mitigated by an exception to the dual sovereignty doctrine first recognized by this court in United States v. Guzmán, 85 F.3d 823 (1st Cir. 1996). In Guzmán, we interpreted certain language of the Supreme Court in Bartkus v. Illinois, 359 U.S. 121 (1959), to mean that an exception to the dual sovereignty doctrine (the "Bartkus exception") exists where "one sovereign so thoroughly dominates or manipulates the prosecutorial machinery of another that the latter retains little or no volition in its own proceedings." Id. at 827. This exception applies with equal force in the Sixth Amendment context. Thus, if it appears that one

sovereign is controlling the prosecution of another merely to circumvent the defendant's Sixth Amendment right to counsel, under the Bartkus exception the dual sovereignty doctrine will not apply. We believe that this exception will help prevent law enforcement officials from making an end run around the right to counsel.

Coker next argues that, in the event we find that the dual sovereignty doctrine applies in the Sixth Amendment right to counsel context, we should apply the Bartkus exception to his case because the federal and state investigations were inextricably intertwined and because the federal agents were aware of the state charges and that Coker had a lawyer for those charges when they interviewed him.

In Guzmán, we stated that a defendant arguing for the exception to the dual sovereignty doctrine "must proffer evidence sufficient to establish a prima facie case that the two prosecutions were for the same offense." Id. In other words, Coker "must produce some evidence tending to prove that . . . one sovereign was a pawn of the other, with the result that the notion of two supposedly independent prosecutions is merely a sham." Id. Coker has failed to carry this entry-level burden.

The district court found that

> [t]he state authorities began an investigation and interviewed witnesses on the day of the incident. Within a day or two, they notified the BATF of the possibility of a federal crime, and for a time the two sovereigns continued the investigation in parallel.

> Shortly after the BATF became involved, however, the state effectively ended its investigation. The federal investigation continued, Coker was indicted by a federal grand jury, and the state charges against him were dropped.

Coker, 298 F. Supp. 2d at 192. We find no clear error in these factual determinations made by the district court, nor do we believe that Coker has pointed to any evidence tending to show that one of the prosecutions was a sham. Rather, the "facts show nothing more than the rendering of routine intergovernmental assistance. Cooperative law enforcement efforts between independent sovereigns are commendable, and, without more, such efforts will not furnish a legally adequate basis for invoking the . . . exception to the dual sovereign rule." Guzmán, 85 F.3d at 828.

Coker relies heavily on the Eighth Circuit's decision in United States v. Red Bird, 287 F.3d 709 (8th Cir. 2002). In Red Bird, the defendant was alleged to have committed a rape on a Native American reservation. Id. at 711. He was arraigned in a tribal court and had an attorney appointed to assist in his representation. Id. The FBI was informed of the charge, and a tribal investigator assisted an FBI agent in locating and interviewing the defendant without counsel's presence. Id. The defendant was later prosecuted on federal rape charges. Id. at 712. The Eighth Circuit rejected the government's dual sovereignty

argument and found that evidence obtained from the interview was inadmissible. Id. at 714-15.

The basis for the court's decision in Red Bird is not entirely clear. On the one hand, the court looked to Cobb and, using the Blockburger test, determined that the tribal and federal offenses were the same for Sixth Amendment purposes because they contained the same essential elements. Id. at 715. In so doing, the court rejected the government's argument that the dual sovereignty doctrine applied in the Sixth Amendment context. On the other hand, the court repeatedly emphasized the interconnectedness of the tribal and federal investigations as a reason for finding that the dual sovereignty doctrine did not apply. For example, the court noted that tribal governments and federal authorities commonly worked together in investigating and prosecuting crimes committed on reservations and that "tribal sovereignty is unique and limited." Id. at 713, 715 (internal quotation marks and citation omitted).

Coker argues that Red Bird represents an exception to the dual sovereignty doctrine. While we think that Red Bird is not as clear as Coker believes, to the extent that Red Bird represents such an exception, Coker's case is distinguishable. As the government points out, the relationship between the state and federal investigations in Coker's case is different from the relationship between the tribal and federal investigations in Red

Bird. In Red Bird, there was evidence that tribal and federal authorities commonly cooperated in investigations. In Coker's case, although there was a certain amount of routine intergovernmental assistance, there was no evidence that the two sovereigns consistently worked together in investigations. Further, there was no evidence here to suggest that one of the prosecutions was a sham or that one of the sovereigns was the pawn of the other, while in Red Bird, the limited and unique nature of tribal sovereignty caused the court's concern. We therefore find that the exception to the dual sovereignty doctrine does not apply to Coker's case.

In sum, we hold that, as a result of the Supreme Court's decision in Cobb, the dual sovereignty doctrine applies in the Sixth Amendment right to counsel context. The state and federal offenses in Coker's case were thus different offenses for Sixth Amendment purposes and Coker's right to counsel had not attached to the uncharged federal offense when he was interviewed by the federal agents. The district court did not err in denying Coker's motion to suppress.

**B. Harmless Error**

Even if we were to find that the district court erred in denying Coker's motion to suppress, any error would be harmless at best. Since the issue in this case is constitutional in nature, the government would have the burden of proving harmless error

beyond a reasonable doubt. See United States v. Ventura-Cruel, 356 F.3d 55, 64 n.12 (1st Cir. 2003). In other words, the government would have to prove beyond a reasonable doubt that Coker would have been convicted even if his confession had not been admitted into evidence.

Coker correctly notes that we have stated that "[c]onfessions are by nature highly probative and likely to be at the center of the jury's attention." Id. at 64 (quoting United States v. León-Delfis, 203 F.3d 103, 112 (1st Cir. 2000)). However, having reviewed the record, we are convinced that, even in the absence of the confession, the evidence against Coker was so overwhelming that he would have been convicted.

The government presented the testimony of two residents of the apartment building who witnessed Coker yelling outside of the building and entering and exiting the building just before the fire started. The first witness, April Loftman, lived on the second floor of the apartment building. On the night in question, Loftman was awake feeding her baby when she heard someone screaming outside of her window. Loftman looked out of her front window and saw a man on the sidewalk in front of the building, pacing back and forth, yelling and pointing at Edith Drame's window, which was on the third floor of the building just above Loftman's apartment. The man was standing just beneath her window, and Loftman testified that the area was well-lit. Loftman heard the man say that "you

played the wrong person" and that he was going to "blaze this mother fucker up." Loftman also noticed a Nissan 280Z with a T-roof parked in the street facing the wrong direction. She saw a straw hat on the front passenger seat.

Loftman saw the man enter the building. She went to her front door and looked through her peephole to see where the man was going. She saw the man walk past her door and heard him walk up the stairs to the third floor. She heard the man bang on a door on the third floor and then heard him walk back down the stairs. When Loftman heard the door to the building open and shut, she returned to her window. She observed the same man standing outside and screaming. The man eventually went to his car, the Nissan with a T-roof, at which time another man driving a Volkswagen pulled up to the building. Loftman recognized the driver as a man who frequented the third floor to engage in drug activity. This second man entered the building, and the first man followed shortly thereafter. Loftman heard the second man go to the third floor and then she heard a door slam shut. Loftman then heard the first man come up the stairs and jiggle the door handle to her apartment, apparently searching for the second man. Loftman panicked and called the Lynn Police Department, who told her to call back if anything else happened.

Loftman heard the upstairs door shut and heard footsteps on the stairs. She went back to the window and saw both men

outside of the building. It appeared to Loftman that the men had a brief conversation before the man in the Volkswagen got into his car and drove off. Loftman then saw the first man re-enter the building and heard him go upstairs and knock on Edith Drame's door. When he got no answer, the man left the building. Loftman testified that the man again said that he was going to blaze the building before getting into his car and leaving.

About ten minutes later, Loftman heard a car door slam in front of the building. She looked out her window and saw the same Nissan 280Z and the same man. The man got out, opened his trunk and entered the building.[10] Loftman listened carefully but heard no footsteps. Shortly thereafter, she heard the front door shut again and saw the man go directly to his car and leave. Loftman then went back to her peephole but could see only darkness. She opened her door and saw that the hallway was full of smoke.

The second witness, Bill Terrell, also lived on the second floor. He testified that on the night in question he was awakened by the sounds of a man yelling in the street. He looked out his window and saw a man standing outside yelling at the building. This man was the only person that Terrell saw outside. Terrell testified that he heard the man state that "you beat the wrong person. I'm going to come back and I'm going to blaze this

[10] At some point, Loftman heard the sound of glass breaking but was unable to recall when exactly she heard this.

whole spot up." The man eventually ran into the building. Terrell went to his front door and heard the man running up the stairs yelling "I'm going to fucking kill you."

As the man exited the building, Terrell heard a smash. He stuck his body halfway out of his window and saw the man holding a metal bat. Terrell saw the man go to his car, which he described as a sports car with a T-roof, throw the bat inside, and drive off. After five to eight minutes, Terrell heard a car door slam. He looked out the window and saw the same car parked outside. Terrell did not see anyone around the car but heard the sounds of someone in the hallway. He called Loftman, who told him that she thought she smelled smoke. Terrell then opened his door and saw a big cloud of smoke in the hallway.

As we noted earlier, Coker was found driving a Nissan sports car with a T-roof. A straw hat and metal bat with glass embedded in it was found in his car, as were a pair of rubber gloves and a butane lighter. In addition, both Loftman and Terrell identified Coker that evening as the man they had seen outside of their building. At trial, Loftman again identified Coker as the man she had seen outside of her window. Terrell was unable to make an in-court identification because he could no longer remember what the man looked like. However, he testified that he was certain that the man he had identified the morning of the fire was the man he had seen in front of his building.

In sum, the government had the testimony of two witnesses who saw Coker outside of the building yelling and making threats, including that he was going to kill someone and that he was going to "blaze" this building. They saw Coker enter the building and exit just before they noticed smoke. They also identified Coker's car, as well as objects in the car. Based on this testimony and the corroborating physical evidence, we are convinced that a jury would have convicted Coker even without evidence of the confession.[11] Therefore, any possible error from admitting the confession was harmless at best.

## III. Conclusion

For the foregoing reasons, Coker's conviction is **affirmed**.

---

[11] Coker argues that his counsel did not attempt to impeach the identification testimony given by Loftman and Terrell at trial because it would have been useless given the confession. Coker argues that, if the confession had been suppressed, he would have impeached the identification testimony with evidence that (1) Loftman and Terrell were driven together to the scene of the show-up identification, (2) Loftman and Terrell spoke about the case as they were being driven, and (3) Terrell identified Coker only after Loftman identified Coker. Having considered the witnesses' testimony and the "impeachment evidence" that Coker mentions, we believe that a jury would have reached the same result even if Coker's counsel had attempted to impeach the identification testimony. Coker also argues that without the confession, he could have attempted to focus the jury on the man in the Volkswagen as a possible suspect. However, Loftman testified that the man in the Volkswagen left the scene well before the fire began and did not return. Also, the testimony of both Loftman and Terrell showed that Coker was the only person who entered and exited the building just before the fire. We do not believe that a jury would have been convinced by Coker's argument, given the testimony of the two witnesses and the corroborating physical evidence.

**"Concurring opinions follows."**

**CYR, Senior Circuit Judge (Concurring).** The admission into evidence of the Coker confession violated the Sixth Amendment right to have counsel present during the post-indictment interview. I would affirm on the ground that the violation was harmless beyond a reasonable doubt. I write separately, since I am unable to agree with the panel decision that no Sixth Amendment violation occurred, and I am concerned that its alternate holding may invite serious precedential consequences. See California v. United States, 438 U.S. 645, 689 n.10 (1978) (stating that court's alternate holdings are not obiter dicta, but have full precedential effect); Natural Res. Def. Council, Inc. v. Nuclear Regulatory Comm'n, 216 F.3d 1180, 1189 (D.C. Cir. 2000) (same).

Prior to Cobb, there was no question but that the "separate sovereign" doctrine, pursuant to which federal and state prosecutions for the same offense were not deemed offensive to the Fifth Amendment double jeopardy clause, had no application outside the double jeopardy context. For instance, the separate sovereign doctrine neither applies to the Fourth Amendment protection from unreasonable searches and seizures, see Elkins v. United States, 364 U.S. 206, 208 (1960) ("[A]rticles obtained as a result of an unreasonable search and seizure by state officers, without involvement of federal officers," cannot "be introduced in evidence against a defendant over his timely objection in a federal criminal trial"), nor to the Fifth Amendment privilege against self-

incrimination, see Murphy v. Waterfront Comm'n of N.Y. Harbor, 378 U.S. 52, 55 (1964) (stating that the policy reasons underlying the self-incrimination prohibition are "defeated when a witness can be whipsawed into incriminating himself under both state and federal law even though the constitutional privilege against self-incrimination is applicable to each"). Elkins and Murphy wisely recognized that allowing the separate sovereign doctrine to operate in the context of these important constitutional protections would encourage collusion between the federal and state sovereigns, one sovereign obtaining evidence in violation of defendants' constitutional rights, then passing the evidence on a "silver platter" to the other sovereign, which would then be free to utilize the tainted evidence in its own prosecution with no risk of suppression. Elkins, 364 U.S. at 208. Obviously, no comparable policy concerns regarding evidence-gathering are presented in the double jeopardy context.

Read properly, Cobb does not compel the anomaly which the majority now countenances, viz., permitting federal and state authorities to violate a defendant's Sixth Amendment right to counsel where they are prohibited from undertaking similar collusive actions with respect to Fourth Amendment and Fifth Amendment rights. Indeed, the Sixth Amendment right to counsel has been long recognized as among the constitutional protections most critical to ensuring the conduct of fair criminal trials. See

Massiah v. United States, 377 U.S. 201, 205 (1964); Gideon v. Wainwright, 372 U.S. 335, 343-44 (1963); Johnson v. Zerbst, 304 U.S. 459, 462-63 (1938). In Cobb, the federal government was not involved. Rather, the State indicted Cobb for burglary, later interrogated him, without the aid of counsel, concerning a murder committed during that burglary, and used his incriminating statements during that post-indictment interview to indict him for that murder. On appeal, the question was whether the burglary and murder were the same "offense." Although some courts had devised a test which considered two crimes the same if they were factually related (e.g., committed on the same day), the Court imported the Blockburger test from the double jeopardy definition of "offense," and held that two offenses are not the same for Sixth Amendment purposes if each requires proof of a fact that the other does not. Cobb, 532 U.S. at 173. It was in this straitened context that the Court stated that "[w]e see no constitutional difference between the meaning of the term 'offense' in the contexts of double jeopardy and of the right to counsel." Id.

Here, there is no question but that Coker was questioned after his indictment regarding the "same offense," and under Cobb and the Blockburger test, his Sixth Amendment right to counsel had attached. In order to find otherwise, one must assume that the Court held that, the particular facts of the case before it notwithstanding, it meant to decide that henceforth there would be

no conceivable differences between the term "offense" in the double jeopardy and Sixth Amendment contexts. The Court in Cobb did not even consider the policy issues raised in Elkins and Murray, for a simple reason: the case before it did not involve separate sovereigns.

> 'If there is one doctrine more deeply rooted than any other in the process of constitutional adjudication, it is that we ought not to pass on questions of constitutionality . . . unless such adjudication is unavoidable.' . . . It has long been the Court's 'considered practice not to decide abstract, hypothetical or contingent questions . . . or to decide any constitutional question in advance of the necessity for its decision . . . or to formulate a rule of constitutional law broader than is required by the precise facts to which it is to be applied . . . or to decide any constitutional question except with reference to the particular facts to which it is to be applied.'

Clinton v. Jones, 520 U.S. 681, 690 n.11 (1997) (citations omitted). Especially in light of Elkins and Murray, and their focus upon the important policy of preventing collusive end-runs around constitutional safeguards, there remains considerable doubt whether the Court, if and when confronted with a separate sovereign case, would hold that the Sixth Amendment right to counsel should be treated less cordially than the Fourth and Fifth Amendment rights, absent some compelling reason for doing so. See United States v. Mills, 412 F.3d 325, 329-30 (2d Cir. 2005) (holding that Cobb did not intend to import separate sovereign doctrine into

Sixth Amendment context); cf. United States v. Red Bird, 287 F.3d 709, 715 (8th Cir. 2002) (refusing to apply separate sovereign doctrine to Sixth Amendment right to counsel in joint federal-tribal crime investigation).

These policy concerns cannot be fully assuaged simply by resort to the Bartkus exception to the separate sovereign doctrine in the double jeopardy context, since it is "limited to situations in which one sovereign so thoroughly dominates or manipulates the prosecutorial machinery of another that the latter retains little or no volition in the proceedings." United States v. Guzmán, 85 F.3d 823, 827 (1st Cir. 1996). Obviously, this leaves out much of the mutual collusion of independent sovereigns which is the subject of Elkins and Murray, and creates a portentous risk of abuse in this age of increasing federal-state cooperation. See United States v. Martínez, 972 F.2d 1100, 1105 (9th Cir. 1992). I see no principled reason that the Sixth Amendment right to counsel ought to be subject to the separate sovereign doctrine when the Fourth Amendment and Fifth Amendment self-incrimination rights are not.

Nor can I agree with my colleague's co-concurrence, which finds this overly broad interpretation of Cobb consonant with the Court's decisions not unnecessarily to thwart police investigations of crime, for the argument improperly demotes Sixth Amendment protection from substance to mere form, and overlooks the countervailing policy interests discussed in Elkins and Murray.

The Sixth Amendment right to counsel already has built-in safeguards: the right can be invoked only for the offense for which defendant is under indictment, not for "new or additional crimes," Maine v. Moulton, 474 U.S. 159, 179 (1985), and "cannot be invoked once for all future prosecutions," McNeil v. Wisconsin, 501 U.S. 171, 175 (1991). The rationale advocated by the co-concurrence would render Sixth Amendment protections essentially meaningless, subject to the most blatant and irremediable manipulation. See Cobb, 532 U.S. at 168 (Breyer, J., dissenting) ("The Constitution does not take away with one hand what it gives with the other.").[12]

For these reasons, I do not join in the alternative holding that the police interview with Coker did not violate his Sixth Amendment right to counsel. At the very least, prudence counsels that we refrain from deciding this difficult and important constitutional issue. See Bellville v. Town of Northboro, 375 F.3d 25, 30 (1st Cir. 2004) ("Normally, we endeavor to avoid deciding constitutional issues and attempt to decide cases on the narrowest grounds possible."). However, I do agree with my colleagues in their alternative holding: that any Sixth Amendment violation was

---

[12] My concurring colleague also advances his Cobb interpretation as affording police officers the advantage of a clear bright-line rule, but the same can be said of a rule which does not allow any invocation of the separate sovereign doctrine as a justification for a post-indictment interview concerning the offense of indictment. Be that as it may, clarity has never been the paramount benchmark of constitutional interpretation, which often requires difficult judgment calls by law enforcement officials in the field.

harmless beyond a reasonable doubt. Although I recognize that a confession normally carries great evidentiary heft, see United States v. Carpenter, 403 F.3d 9, 13 (1st Cir.), cert. denied, 125 S. Ct. 2284 (2005), the other circumstances of this case persuade me that the error was harmless, see, e.g., United States v. Downs-Moses, 329 F.3d 253, 267-68 (1st Cir.), cert. denied sub nom. Ward-O'Neill v. United States, 540 U.S. 916 (2003).

**"Concurring opinion follows."**

**HOWARD, Circuit Judge (Concurring).** I agree with Judge Torruella that the government did not violate defendant Edward Coker's Sixth Amendment right to counsel, and that Texas v. Cobb, 532 U.S. 162 (2001), is instructive as to why. Coker argues that the interests protected by the prohibition against government contact with an accused after the right to counsel has attached would be undermined if federal authorities, investigating whether an incident that already has given rise to state charges also should be charged as a parallel federal offense, were permitted to question the accused without first approaching his lawyer in the state proceeding. The argument is a classic one for substance over form: the substance of the right to counsel would be unduly compromised if, under these circumstances, the court were to accord dispositive significance to the fact that the federal crime being investigated, while containing the same elements as the charged state crime, is formally distinct because it is a crime against a separate sovereign.

The problem with Coker's argument is that, sometimes, a formalist approach itself serves substantive interests. In this case, the formalist approach urged by the government will serve an interest in permitting investigating authorities to talk with witnesses and suspects who have been charged with formally distinct offenses -- even those arising from the same incident under investigation. And it will do so by means of a bright-line rule

that eliminates the need for judgment calls about where constitutional boundaries might lie. As Judge Torruella explains, a majority of the Supreme Court -- albeit a slim one -- has in no less compelling circumstances favored the investigative interest over the admittedly substantial interests invoked by Coker. See Cobb, 532 U.S. at 171-72. Having constructed and justified the formalist approach, the Court should be the source of any change in legal direction.[13]

[13] I acknowledge the merit of our concurring colleague's well articulated prudential concerns, but I cannot join his analysis of whether there has been a Sixth Amendment violation, because the analysis is in my view argumentum ad consequentiam.