RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 18a0058p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

JOHN R. TURNER,

*Petitioner-Appellant,*

v.

UNITED STATES OF AMERICA,

*Respondent-Appellee.*

No. 15-6060

Appeal from the United States District Court for
the Western District of Tennessee at Memphis.
Nos. 2:12-cv-02266; 2:08-cr-20302-1—Samuel H. Mays, Jr., District Judge.

Argued:  October 11, 2017

Decided and Filed:  March 23, 2018

Before:  COLE, Chief Judge; BATCHELDER, MOORE, CLAY, GIBBONS,
ROGERS, SUTTON, COOK, McKEAGUE, GRIFFIN, KETHLEDGE, WHITE,
STRANCH, DONALD, THAPAR, and BUSH, Circuit Judges.[*]

_____

## COUNSEL

**ARGUED EN BANC:**  Robert L. Hutton, GLANKLER BROWN, PLLC, Memphis, Tennessee,
for Appellant.  Kevin G. Ritz, UNITED STATES ATTORNEY'S OFFICE, Memphis,
Tennessee, for Appellee.  **ON SUPPLEMENTAL BRIEF:**  Robert L. Hutton, GLANKLER
BROWN, PLLC, Memphis, Tennessee, for Appellant.  Kevin G. Ritz, Murrell G. Martindale,
UNITED STATES ATTORNEY'S OFFICE, Memphis, Tennessee, for Appellee.  Steven J.
Mulroy, UNIVERSITY OF MEMPHIS, Memphis, Tennessee, Stephen Ross Johnson, RITCHIE,
DILLARD, DAVIES & JOHNSON, P.C., Knoxville, Tennessee, Adam Lamparello, Newport,
Kentucky, for Amici Curiae.

    BATCHELDER, J., delivered the opinion of the court in which GIBBONS, ROGERS,
SUTTON, COOK, McKEAGUE, GRIFFIN, KETHLEDGE, THAPAR, and BUSH, JJ., joined,

_____

[*]The clerk submitted this case to the en banc panel of the Sixth Circuit Court of Appeals before Judge Joan
L. Larsen received her commission on November 8, 2017.

and CLAY and WHITE, JJ., joined in the result.  BUSH, J. (pp. 9–22), delivered a separate dubitante opinion in which KETHLEDGE, J., joined.  CLAY, J. (pp. 23–37), delivered a separate concurrence in the judgment only in which WHITE, J., joined in Part I.  WHITE, J. (pp. 38–39), delivered a separate concurrence in the judgment only.  STRANCH, J. (pp. 40–48), delivered a separate dissent, in which COLE, C.J., and MOORE and DONALD, JJ., joined.

---

**OPINION**

---

ALICE M. BATCHELDER, Circuit Judge.  Appellant John Turner asks us to overrule nearly four decades of circuit precedent holding that the Sixth Amendment right to counsel does not extend to preindictment plea negotiations.  *See United States v. Moody*, 206 F.3d 609, 614–15 (6th Cir. 2000) (citing *United States v. Sikora*, 635 F.2d 1175 (6th Cir. 1980)).  We decline to do so.  Our rule—copied word for word from the Supreme Court's rule—is that the Sixth Amendment right to counsel attaches only "at or after the initiation of judicial criminal proceedings—whether by way of formal charge, preliminary hearing, indictment, information, or arraignment." *Id.* at 614 (quoting *Kirby v. Illinois*, 406 U.S. 682, 689 (1972) (plurality opinion)); *see also United States v. Gouveia*, 467 U.S. 180, 188 (1984).  The district court followed this rule, and we AFFIRM.

I.

In 2007, after appellant John Turner robbed four Memphis-area businesses at gunpoint, he was arrested by a Memphis police officer who was part of a joint federal-state "Safe Streets Task Force."  Turner hired an attorney.  A Tennessee grand jury indicted Turner on multiple counts of aggravated robbery, and Turner's attorney represented him in plea negotiations with state prosecutors.

During the state proceedings, the state prosecutor informed Turner's attorney that the United States Attorney's Office planned to bring federal charges against Turner.  Turner's attorney contacted the Assistant United States Attorney ("AUSA") responsible for Turner's case, who confirmed that the United States planned to bring federal robbery and firearms charges that could result in a mandatory minimum of eighty-two years' imprisonment for the firearms

charges alone.　The AUSA conveyed to Turner's attorney a plea offer of fifteen years' imprisonment which would expire if and when a federal grand jury indicted Turner.

Turner's attorney says that he correctly and timely relayed the federal plea offer to Turner, but that Turner refused it.　Turner disputes this.　In any event, Turner did not accept the federal plea offer before the federal grand jury in the United States District Court for the Western District of Tennessee indicted him in 2008.　Turner hired a new attorney and negotiated a plea deal which resulted in twenty-five years' imprisonment.　As part of Turner's plea agreement, he waived his right to file a direct appeal.

In 2012, Turner filed a 28 U.S.C. § 2255 motion alleging that his original attorney rendered constitutionally ineffective assistance during the federal plea negotiations.　The district court, following Sixth Circuit and Supreme Court precedent, found that Turner's Sixth Amendment right to counsel had not yet attached during his preindictment federal plea negotiations and denied his motion.

A panel of this court affirmed the district court.　*Turner v. United States*, 848 F.3d 767 (6th Cir. 2017).　Turner then filed a petition for rehearing en banc, which this court granted. *Turner v. United States*, 865 F.3d 338 (6th Cir. 2017).

## II.

Turner raises two issues: (1) whether the Sixth Amendment right to counsel extends to preindictment plea negotiations; and (2) whether an indictment in a state prosecution triggers a criminal defendant's Sixth Amendment right to counsel for the purposes of forthcoming federal charges based on the same underlying conduct.　Both of these issues are questions of law that we review de novo.　*See Moody*, 206 F.3d at 612.

### A.

"In all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defen[s]e."　U.S. CONST. amend. VI.　The Sixth Amendment right to counsel "does not attach until a prosecution is commenced."　*Rothgery v. Gillespie Cty.*, 554 U.S. 191, 198 (2008) (quoting *McNeil v. Wisconsin*, 501 U.S. 171, 175 (1991)).　A prosecution commences

only at or after "the initiation of adversary judicial criminal proceedings—whether by way of formal charge, preliminary hearing, indictment, information, or arraignment." *Id.* (quoting *Gouveia*, 467 U.S. at 188).

Once the Sixth Amendment right to counsel attaches, criminal defendants have a right to the assistance of counsel during "critical stages" of the prosecution. *Missouri v. Frye*, 566 U.S. 134, 140 (2012); *Montejo v. Louisiana*, 556 U.S. 778, 786 (2009). The "core purpose" of the Sixth Amendment right to counsel was to ensure that criminal defendants could receive assistance of counsel "at trial," *United States v. Ash*, 413 U.S. 300, 309 (1973), but the Supreme Court has "expanded" the right to certain pretrial "trial-like confrontations" that present "the same dangers that gave birth initially to the right itself." *Id.* at 311–12. These critical stages include "arraignments, postindictment interrogations, postindictment lineups, and the entry of a guilty plea." *Frye*, 566 U.S. at 140.

Six years ago, in *Missouri v. Frye*, 566 U.S. at 144, and *Lafler v. Cooper*, 566 U.S. 156, 162 (2012), the Supreme Court extended the Sixth Amendment right to counsel to a new critical stage: plea negotiations. It did so because plea negotiations have become "central to the administration of the criminal justice system" and because they frequently determine "who goes to jail and for how long," making them potentially "the only stage when legal aid and advice would help" many criminal defendants. *Frye*, 566 U.S. at 143–44 (citations omitted). In both *Frye* and *Lafler*, however, the plea negotiations occurred after the criminal defendants had been formally charged. *See id.* at 138; *Lafler*, 566 U.S. at 161. Neither *Frye* nor *Lafler* specifically addresses attachment, but they are critical-stage cases which we have found "accept the rule that the right to counsel does not attach until the initiation of adversary judicial proceedings." *Kennedy v. United States*, 756 F.3d 492, 493 (6th Cir. 2014).

Turner argues that the Supreme Court's reasoning for holding that postindictment plea negotiations are critical stages applies equally to preindictment plea negotiations. But Turner makes the fundamental "mistake" of confusing the "critical stage question" with the "attachment question." *Rothgery*, 554 U.S. at 211 (internal quotation marks omitted). These questions must be kept "distinct." *Id.* at 212 (citation omitted). That is why the Supreme Court has repeatedly rejected attempts by criminal defendants to extend the Sixth Amendment right to counsel to

preindictment proceedings, even where the same proceedings are critical stages when they occur postindictment. *Compare United States v. Wade*, 388 U.S. 218, 236–37 (1967) (Sixth Amendment right to counsel in postindictment lineups), *with Kirby*, 406 U.S. at 690 (plurality opinion) (no Sixth Amendment right to counsel in preindictment lineups); *compare Massiah v. United States*, 377 U.S. 201, 205–06 (1964) (Sixth Amendment right to counsel in postindictment interrogations), *with Moran v. Burbine*, 475 U.S. 412, 431–32 (1986) (no Sixth Amendment right to counsel in preindictment interrogations).

The Supreme Court's attachment rule is crystal clear. It is "firmly established" that a person's Sixth Amendment right to counsel "attaches only at or after the time that adversary judicial proceedings have been initiated against him." *Gouveia*, 467 U.S. at 187. Because the Supreme Court has not extended the Sixth Amendment right to counsel to any point before the initiation of adversary judicial criminal proceedings, we may not do so. *See Moody*, 206 F.3d at 614. We therefore reaffirm our long-standing rule that the Sixth Amendment right to counsel does not extend to preindictment plea negotiations.

Turner argues that other circuits extend the Sixth Amendment right to counsel to preindictment "adversarial confrontations," but no other circuit has definitively extended the Sixth Amendment right to counsel to preindictment plea negotiations. Only one circuit has implied that the Sixth Amendment right to counsel extends to preindictment plea negotiations, but that opinion was non-precedential and the issue of when the Sixth Amendment right to counsel attaches was not before the court in that case. *See United States v. Giamo*, 665 F. App'x 154, 156–57 (3d Cir. 2016). A minority of circuits have also discussed the "possibility that the right to counsel might conceivably attach before any formal charges are made, or before an indictment or arraignment." *Roberts v. Maine*, 48 F.3d 1287, 1291 (1st Cir. 1995); *see Perry v. Kemna*, 356 F.3d 880, 895–96 (8th Cir. 2004) (Bye, J., concurring) (collecting cases). None of these circuits, however, has extended the Sixth Amendment right to counsel to preindictment plea negotiations. There is therefore no circuit split on this issue.

B.

Turner also argues that even if the Sixth Amendment right to counsel does not ordinarily attach to preindictment plea negotiations, an indictment in a state prosecution triggers a criminal defendant's Sixth Amendment right to counsel for the purposes of forthcoming federal charges based on the same underlying conduct.

Turner appears to have waived this argument, because he did not make this argument to the district court or to the panel on appeal. *See Scottsdale Ins. Co. v. Flowers*, 513 F.3d 546, 552 (6th Cir. 2008). However, the government has not argued waiver. Additionally, where a newly-raised issue is "purely one of law requiring no new or amplified factual determination" and has been "fully briefed and argued," we may exercise our discretion to deviate from the general waiver rule. *Taft Broad. Co. v. United States*, 929 F.2d 240, 244–45 (6th Cir. 1991) (citations omitted). We do so here and address Turner's argument on the merits.

The Sixth Amendment right to counsel is "offense specific." *McNeil*, 501 U.S. at 175. "It cannot be invoked once for all future prosecutions," *id.*, or once for all "factually related" offenses. *Texas v. Cobb*, 532 U.S. 162, 168–69 (2001). Turner is therefore correct only if both the state and federal governments prosecuted him for the "same offense." *Id.* at 173.

In determining what constitutes the "same offense," the Supreme Court has instructed us to apply the test in *Blockburger v. United States*, 284 U.S. 299 (1932). *Cobb*, 532 U.S. at 173. "The applicable rule is that, where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not." *Blockburger*, 284 U.S. at 304. This test applies to the Sixth Amendment right to counsel because the Supreme Court "see[s] no constitutional difference between the meaning of the term 'offense' in the contexts of double jeopardy and of the right to counsel." *Cobb*, 532 U.S. at 173.

The circuit courts are split on whether the Supreme Court in *Cobb* "incorporated all of its double jeopardy jurisprudence (including the dual sovereignty doctrine)" into its Sixth Amendment right-to-counsel jurisprudence "or [incorporated] merely the *Blockburger* test." *United States v. Coker*, 433 F.3d 39, 43 (1st Cir. 2005).

The majority view is that when a criminal defendant's conduct violates both state and federal law, that defendant commits two separate offenses, even when the state and federal offenses contain the same essential elements. *Id.* at 43–45; *United States v. Holness*, 706 F.3d 579, 590–91 (4th Cir. 2013); *United States v. Burgest*, 519 F.3d 1307, 1310 (11th Cir. 2008); *United States v. Avants*, 278 F.3d 510, 517 (5th Cir. 2002). Because the Supreme Court saw "no constitutional difference between the meaning of the term 'offense' in the contexts of double jeopardy and of the right to counsel," *Cobb*, 532 U.S. at 173, these circuits apply the dual sovereignty doctrine from the double-jeopardy context to the Sixth Amendment right-to-counsel context. Under that doctrine, when a defendant "in a single act violates the 'peace and dignity' of two sovereigns by breaking the laws of each, he has committed two distinct 'offen[s]es.'" *Heath v. Alabama*, 474 U.S. 82, 88 (1985) (citation omitted).

The minority view is that when a criminal defendant's conduct violates both state and federal law, the defendant nevertheless commits only one offense when the state and federal offenses contain the same essential elements. *See United States v. Mills*, 412 F.3d 325, 330 (2d Cir. 2005); *United States v. Red Bird*, 287 F.3d 709, 715 (8th Cir. 2002). These circuits interpret *Cobb* to incorporate only the *Blockburger* test and not the dual-sovereignty doctrine into the Sixth Amendment right-to-counsel context.

We join the majority view because it more closely follows Supreme Court precedent than does the minority view. Using the dual-sovereignty doctrine to determine the meaning of the term "offense" in the double-jeopardy context but not in the Sixth Amendment right-to-counsel context would create a constitutional difference where the Supreme Court saw none. *See Coker*, 433 F.3d at 44. We therefore hold that when a criminal defendant's conduct violates both state and federal law that defendant commits two separate offenses, even when the essential elements of the state and federal offenses are the same.

C.

Turner's sole basis for relief in his 28 U.S.C. § 2255 motion was that his original attorney provided constitutionally ineffective assistance during Turner's preindictment federal plea negotiations. But Turner's Sixth Amendment right to counsel had not yet attached during those

preindictment plea negotiations. There can be no constitutionally ineffective assistance of counsel where there is no Sixth Amendment right to counsel in the first place. *Smith v. Ohio Dep't of Rehab. & Corr.*, 463 F.3d 426, 433 (6th Cir. 2006) (citing *Coleman v. Thompson*, 501 U.S. 722, 752 (1991)).

III.

For the foregoing reasons, we AFFIRM the judgment of the district court.

---

**DUBITANTE**

---

JOHN K. BUSH, Circuit Judge, concurring dubitante.  History sometimes reveals more import to words than they at first seem to have.  And faithful adherence to the Constitution and its Amendments requires us to examine their terms as they were commonly understood when the text was adopted and ratified, rather than applying meaning derived years later that may weaken constitutional rights.  This case calls for such an examination.

The Sixth Amendment states in pertinent part: "In all criminal prosecutions, the accused shall enjoy the right . . . to have the assistance of counsel for his defence."  We must decide whether a criminal suspect, having received from a federal prosecutor an offer to enter into a plea agreement that requires pre-indictment acceptance, is an "accused" in a "criminal prosecution[]" and therefore entitled to a constitutional right to counsel.

We know that it is settled that the *substantive* right to counsel includes the right to communication of a favorable plea offer: the Supreme Court made that clear in *Lafler v. Cooper*, 566 U.S. 156 (2012), and *Missouri v. Frye*, 566 U.S. 134 (2012).  So no one disputes that defendant-appellant John Turner's right of "assistance of counsel for his defence" includes his counsel's communicating the offer, assuming the right has attached.  Our task, therefore, is to decide only whether that substantive right did attach to Turner upon or before the federal prosecutor's presentment of the plea offer—that is, whether Turner was then an "accused" in a "criminal prosecution."

The majority is correct that we are bound to affirm because of Supreme Court precedents holding that the Sixth Amendment right to counsel attaches only "at or after the initiation of criminal proceedings—whether by way of formal charge, preliminary hearing, indictment, information, or arraignment." *United States v. Moody*, 206 F.3d 609, 614 (6th Cir. 2000).[1]  But

---

[1]I note that the Court's precedents do not expressly state that *only* a "formal charge, preliminary hearing, indictment, information, or arraignment" may trigger the attachment of the right to counsel.  *Cf. Rothgery v. Gillespie Cty.*, 554 U.S. 191, 213 (2008) (holding right to counsel attached to Texas defendant when he was brought before a magistrate for a probable-cause hearing the day after arrest).  This leaves open the possibility that the

the original understanding of the Sixth Amendment gave larger meaning to the words "accused" and "criminal prosecution" than do these precedents, and for that reason, I write separately.

As discussed below, the greater weight of the Founding-era evidence appears to support the propositions that Turner was an "accused" even though he had not yet been indicted federally, and that the communication of an exploding plea-agreement offer by a federal prosecutor that would, if accepted, all but end Turner's criminal litigation, was part of a "criminal prosecution" as those terms were used in the Sixth Amendment. In light of this history of the original meaning of the Sixth Amendment text, the Supreme Court might wish to reconsider its right-to-counsel jurisprudence.

**I**

### A. *The Search for "Original Meaning" in the Historical Record*

The Supreme Court routinely looks to Founding-era dictionaries, acts of the First Congress, early decisions of the federal judiciary, records of the Constitutional Convention and state ratifying conventions, and other Founding-era documents as sources that shed light on the original meaning of constitutional provisions. *See, e.g., Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n*, 135 S. Ct. 2652, 2671–72 (2015); *District of Columbia v. Heller*, 554 U.S. 570, 603–14 (2008); *Marsh v. Chambers*, 463 U.S. 783, 787–91 (1983).

Sometimes the Court has relied on such sources to determine what the Framers *intended* the provision to mean—or, more specifically, what a provision's drafter intended it to mean. *See, e.g., U.S. Term Limits, Inc. v. Thornton*, 514 U.S. 779, 800 (1995). Call this the "What was James Madison thinking?" approach. Yet another method has been to ascertain the understanding of those who ratified the text (in the case of the original Constitution) or amendment (as here). *See, e.g., Alden v. Maine*, 527 U.S. 706, 716–19 (1999). Call this the "What did the ratifiers think that James Madison was thinking?" approach.

---

prosecutor's presentment of the plea offer was itself an "initiation of criminal proceedings." *Moody*, 206 F.3d at 614. Nevertheless, because the Court's precedents imply that attachment of the right to counsel requires at least some post-arrest formalization of the criminal case such as by indictment or magistration, and because there was no such formalization in Turner's case, a reversal here would appear to contravene the Court's attachment jurisprudence.

A third approach, and the one this opinion follows, is to look to the original *public* meaning of a provision in the Constitution, as distinct from the perhaps more technical understanding of the provision that a constitutional drafter or a delegate to a ratifying convention might have held.  *See, e.g.*, *Heller*, 554 U.S. at 576–77 ("In interpreting this text, we are guided by the principle that '[t]he Constitution was written to be understood by the voters; its words and phrases were used in their normal and ordinary as distinguished from technical meaning.' . . . Normal meaning may of course include an idiomatic meaning, but it excludes secret or technical meanings that would not have been known to ordinary citizens in the founding generation.").

Gouverneur Morris, "from whose pen" (according to Madison) came "[t]he finish given to the style and arrangement of the [C]onstitution,"[2] aptly acknowledged: "It is not possible for me to recollect with precision all that passed in the Convention while we were framing the Constitution; and, if I could, it is most probable that a meaning may have been conceived from incidental expressions different from that which they were intended to convey, and very different from the fixed opinions of the speaker."[3]  The same could be said of those who drafted and edited the Bill of Rights.  Accordingly, as Justice Joseph Story emphasized, it should be the objective meaning of the constitutional text, not the drafter's, editor's, or ratifier's subjective intention, that is to be ascertained, for "[t]he people adopted the [C]onstitution according to the words of the text in their reasonable interpretation, and not according to the private interpretation of any particular men."[4]  Call this the "What did the average Joe (or Josephine) from the Founding era understand the words to mean?" approach.

This latter method, like most searches for word meaning, begins with the dictionary. *Cf. Ariz. State Legislature*, 135 S. Ct. at 2671.  Accordingly, I will first consult the prevailing lay and legal dictionaries of the time period when the Sixth Amendment was adopted.  Second, I will

---

[2]Letter from James Madison to Jared Sparks (Apr. 8, 1831), *reprinted in* Gouverneur Morris, *The Diary and Letters of Gouverneur Morris*, vol. 1, at 17 (Anne Cary Morris ed. 1888).

[3]Letter from Gouverneur Morris to Henry W. Livingston (Nov. 25, 1803), *reprinted in* Gouverneur Morris, *The Diary and Letters of Gouverneur Morris*, vol. 2, at 441–42 (Anne Cary Morris ed. 1888).

[4]Joseph Story, *Commentaries on the Constitution of the United States*, vol. I, book III, § 407.

look to Founding-era statutes and legal decisions interpreting the words "accused" and "criminal prosecution" to see whether these words were likely used and understood by the Framers and their contemporaries in a manner consistent with their dictionary definitions and not in some narrower sense. Finally, after articulating how the words "accused" and "criminal prosecution" were likely understood in the Founding era, I will apply that understanding by analogy to the facts of the case before us.

This last step warrants brief explanation. Sometimes the Supreme Court articulates the original meaning of a constitutional provision with sufficient specificity that it applies directly to the facts of the case being decided. *See, e.g.*, *Heller*, 554 U.S. at 624–27 (explaining meaning of the right to bear arms such that the firearms regulation at issue could not then withstand *any* level of judicial scrutiny). But sometimes the Court articulates a more general understanding of such a provision, which it then applies inductively, whether by analogy or otherwise, to the case before it. *See, e.g.*, *United States v. Jones*, 565 U.S. 400, 411 (2012) (applying "an 18th-century guarantee against unreasonable searches" to the government's use of GPS monitoring to track a criminal suspect).

The latter approach is appropriate where, as in *Jones* and as in this case, the Framers could not have foreseen the twenty-first-century context to which the constitutional provision in question would be applied. Indeed, charge bargaining was as unknown to the Framers as GPS technology. *See generally* Albert W. Alschuler, Plea Bargaining and Its History, 79 Colum. L. Rev. 1 (1979). So, rather than ask whether the Founding generation understood the right to counsel to apply during pre-indictment charge bargaining (a question as misguided as asking whether the Founding generation understood the right to privacy to preclude warrantless GPS tracking), one should ask how the Framers and their contemporaries understood the right to counsel to operate in the contexts that they knew, and then apply that understanding by analogy to the present-day charge-bargaining context. *Cf. Maryland v. Craig*, 497 U.S. 836, 862–70 (1990) (Scalia, J., dissenting) (interpreting Confrontation Clause and applying that interpretation to address whether a child witness could testify by one-way closed-circuit television). This is the method that I will now employ.

**B. Historical Evidence of the Original Understanding of the Scope of the Right to Counsel**

1. Founding-Era Dictionaries

Contrary to what one might surmise from Supreme Court precedents, Founding-era dictionaries offer no reason to suppose either that "accused" as used in the Sixth Amendment was commonly understood to mean "indicted" or that it was a term of art understood by the legally trained to mean "indicted." Of the nine prevailing general English dictionaries (that is, non-legal dictionaries) of the Founding era, eight define "accuse" as some version of "to charge with a crime; to blame or censure," and all nine offer a definition much broader than "to indict."[5]

---

[5]Five dictionaries provide a definition of "accuse" that is the same as or nearly identical to "to charge with a crime; to blame or censure." John Ash, *New & Complete Dictionary of the English Language* (London, Edward & Charles Dilly 1775), *available at* https://books.google.com/books?id=LDNAAAAAYAAJ&q=accuse#v= snippet&q=accuse; Samuel Johnson, *A Dictionary of the English Language* (London, J. F. & C. Rivington et al., 7th ed. 1785), *available at* https://books.google.com/books?id=j-UIAAAAQAAJ&q=accuse#v=snippet&q=accuse; William Perry, *The Royal Standard English Dictionary* (Worcester, 1st Am. ed. 1788), *available at* https://books.google.com/books?id=OpkRAAAAIAAJ&q=accuse#v=snippet&q=accuse; Thomas Sheridan, *A Complete Dictionary of the English Language* (London, Charles Dilly, 3d ed. 1790), *available at* https://books.google.com/books?id=pBFJAAAAcAAJ&q=accuse#v=snippet&q=accuse; John Walker, *A Critical Pronouncing Dictionary* (London, G.G.J. & J. Robinson, & T. Cadell, 1791), *available at* https://books.google.com/books?id=DaURAAAAIAAJ&q=accuse#v=snippet&q=accuse.

Two dictionaries add a few more verbs. Rev. James Barclay, *Complete & Universal English Dictionary* (London, J.F. & C. Rivington et al. 1792), *available at* https://books.google.com/books?id=yeUIAAAAQAAJ&q=a ccuse#v=snippet&q=accuse ("To charge with a crime; to inform against, indict, or impeach; to censure."); Thomas Dyche & William Pardon, *A New General English Dictionary* (London, Toplis & Bunney, 18th ed. 1781), *available at* https://books.google.com/books?id=xOcIAAAAQAAJ&q=accuse#v=snippet&q=accuse ("To indict, impeach, charge with a fault.").

One dictionary defines "accusation" as "the intending a criminal action against any one, either in one's own name, or that of the publick." Nathan Bailey, *New Universal Etymological English Dictionary* (London, T. Waller, 4th ed. 1756), *available at* https://books.google.com/books?id=HXQSAAAAIAAJ&q=accuse#v=snippet &q=accuse. All these dictionaries generally define "charge" as "to impute, to put to any one's account," or something substantially similar. The only dictionary that offers a more detailed definition of "accuse" than the eight above-cited dictionaries was Noah Webster's 1828 *American Dictionary of the English Language*: "To charge with, or declare to have committed a crime, either by plaint, or complaint, information, indictment, or impeachment; to charge with an offense against the laws, judicially or by a public process; as, to *accuse* one of a high crime or misdemeanor." *Available at* https://archive.org/stream/americandictiona01websrich#page/104/mode/2up. But even Webster's definition contemplates that an individual may be an "accused" without being indicted. Moreover, Webster offers an expansive definition of "charge": "10. To load or lay on in words, something wrong, reproachful or criminal; to impute to; as, to charge a man with theft. 11. To lay on in words; to impute to; followed by on before the person; as, to charge a crime on the offender . . . ."

As for the four prevailing *legal* English dictionaries of the Founding era, one does not define "accuse" (or related words) at all;[6] the other three define "accusation" by example, citing Clause 39 of the Magna Carta: "By *Magna Charta*, no man shall be imprisoned or condemned on any *accusation*, without trial by his peers, or the law."[7] One can draw two conclusions: "accused" was a word in general usage (not a term with peculiar meaning in the law), and "accused" had a meaning that was broader than "indicted."

Likewise with the Sixth Amendment's reference to "criminal prosecutions": Although there is no particular definition of that phrase, eight of the nine general English dictionaries cited above do define the word "prosecution," and seven of the eight give a primary definition of that term such as "[a] pursuit, an endeavor to carry on any design."[8] This definition contemplates a broad meaning of "prosecution"—something reminiscent of its etymological meaning of pursuing a goal.[9] The dictionaries also include more specific secondary definitions such as "a process at law" and a "suit against a man in a criminal cause."[10] Nor do the legal dictionaries

---

[6]Richard Burn & John Burn, *A New Law Dictionary* (London, A. Strahan & W. Woodfall 1792), *available at* https://books.google.com/books?id=LoxRAAAAYAAJ&q=accuse#v=snippet&q=accuse (next entry after "account" is "ac etiam").

[7]*See* Thomas Potts, *A Compendious Law Dictionary* (London, T. Ostell 1803), *available at* https://books.google.com/books?id=4rQ3AQAAMAAJ&q=accuse#v=snippet&q=accuse; Timothy Cunningham, *A New and Complete Law Dictionary* (London, S. Crowder et al. 1764), *available at* https://books.google.com/books?id=Y580AQAAMAAJ&q=accuse#v=snippet&q=accuse; Giles Jacob, *A New Law Dictionary* (The Savoy, Henry Lintot, 6th ed. 1750), *available at* https://books.google.com/books?id=zdED1S0lCoAC&q=accuse#v=snippet&q=accuse.

[8]*See* Ash, *supra* n.5, *available at* https://books.google.com/books?id=jjNAAAAYAAJ&q=prosecute#v=snippet&q=prosecute; Dyche & Pardon, *supra* n.5, *available at* https://books.google.com/books?id=xOcIAAAAQAAJ&q=pro#v=snippet&q=pro; Sheridan, *supra* n.5, *available at* https://books.google.com/books?id=rBFJAAAAcAAJ&q=pro#v=snippet&q=pro; Walker, *supra* n.5, *available at* https://books.google.com/books?id=DaURAAAAIAAJ&q=pro#v=snippet&q=pro; Barclay, *supra* n.5, *available at* https://books.google.com/books?id=yeUIAAAAQAAJ&q=pro#v=snippet&q=pro; Johnson, *supra* n.5, *available at* https://books.google.com/books?id=j-UIAAAAQAAJ&q=prosecute#v=snippet&q=prosecute; and Webster, *supra* n.5, *available at* http://archive.org/stream/americandictiona02websrich#page/n373/mode/2up.

[9]Indeed, Webster offers the following as the primary definition of prosecution: "1. The act or process of endeavoring to gain or accomplish something; pursuit by efforts of body or mind; as the prosecution of a scheme, plan, design or undertaking; the prosecution of war or of commerce; the prosecution of a work, study, argument or inquiry."

[10]One dictionary defines prosecution *only* as "a criminal or civil suit." Perry, *supra* n.5, *available at* https://books.google.com/books?id=OpkRAAAAIAAJ&q=prosecute#v=snippet&q=prosecute. And one dictionary does not define prosecution (or related words) at all. Bailey, *supra* n.5, *available at* https://books.google.com/books?id=HXQSAAAAIAAJ&q=pro#v=onepage&q=prosecute (next entry after "prosa" is "proselytes").

give reason to define a "prosecution" as occurring only post-indictment: of the four prevailing dictionaries, three do not define the word (or related words) *at all*—and the one legal dictionary that defines "prosecutor" does so only as "he that follows a cause in another's name."[11]  From this evidence, one may draw two conclusions: "prosecution" was in general usage, and it was understood to have a broader meaning than referring only to the post-indictment critical stages of a judicial criminal action.

One also notes that *nowhere* else in the original Constitution or the Amendments does either "accused" or "criminal prosecution" (or a related word) appear except in the Sixth Amendment.  In particular, the Sixth Amendment's unique use of the words "[i]n all criminal *prosecutions*" (emphasis added) to demarcate its rights prompts this question: if Sixth Amendment rights were to attach only after indictment, why didn't the Sixth Amendment state that it applied in a "criminal case" (as used in the Fifth Amendment) or in all criminal "Cases" (as used along with "Controversies" in Article III)?  It is arguable that "[i]n all criminal prosecutions" as used in the Sixth Amendment imparted temporally broader meaning than would have been imparted by the words "[i]n all criminal cases."  This word choice was consistent with the Founding-era dictionaries discussed above and other sources discussed below indicating that a "criminal prosecution," indeed, could begin before a "criminal case" commenced.[12]

---

[11]The three dictionaries that do not define "prosecutor" or related words are Burn & Burn, *supra* n.6, *available at* https://books.google.com/books?id=eAVAAAAAYAAJ&q=pro#v=onepage&q=prosecute (next entry after "prorogue" is "protection"); Jacob, *supra* n.7, *available at* https://books.google.com/books?id=zdED1S0lCoA C&q=pro#v=snippet&q=pro (same); and Potts, *supra* n.7, *available at* https://books.google.com/books?id=4rQ3AQ AAMAAJ&q=prosecute#v=snippet&q=prosecute (same).  The dictionary that defines prosecutor is Cunningham, *supra* n.7, *available at* https://books.google.com/books?id=spc0AQAAMAAJ&q=pro#v=snippet&q=pro.

[12]The Supreme Court wrote in *Counselman v. Hitchcock*, 142 U.S. 547, 563 (1892), "A criminal prosecution under article 6 of the amendments is much narrower than a 'criminal case,' under article 5 of the amendments."  The Court there did not address the *temporal* distinction between the "prosecution" and "case" in light of any Founding-era sources.  Rather, it was discussing the difference in the amendments' scope in terms of *to whom* they applied: whereas Sixth Amendment rights applied only to one who was subject to a criminal prosecution (i.e., a defendant himself), the Fifth Amendment right against self-incrimination applied more broadly, such as to testifying witnesses.  That distinction, of course, has no bearing on the timing question or on this opinion's observation that a federal "criminal prosecution," as originally understood, may begin well in advance of indictment.

## 2. The Crimes Act of 1790 and the Trial of Aaron Burr

Next, to corroborate the dictionary evidence as probative of the original understanding of "accused" and "criminal prosecution," I will examine other relevant uses and interpretations of those words from the Founding era. *Cf., e.g.*, *Marsh*, 463 U.S. at 787–91.

One of the many significant accomplishments of the First Congress was to enact the Crimes Act of 1790, which was the first comprehensive federal criminal statute. The Act's principal author was Senator (and later Chief Justice) Oliver Ellsworth, who was also familiar with the text of the Bill of Rights that the First Congress approved in September 1789.[13]

Some provisions of the Act apply to one who has been "accused *and* indicted" (emphasis added), such as the right to "have a copy of the indictment, and a list of the jury and witnesses." Crimes Act of 1790 § 29. But elsewhere, the Act uses "accused *or* indicted" (emphasis added) in setting forth the rights to present evidence, call witnesses, and to compel the appearance of witnesses. *Id.*[14] These semantics indicate that a person could be considered to be in the general category of an "accused" prior to being put in the more particular subcategory of an "indicted."

And indeed, that is what Chief Justice John Marshall recognized in 1807 when he sat as circuit judge in the criminal matter of Aaron Burr, who stood accused—but not yet indicted—of treason, for allegedly conspiring to provoke insurrection out West in Spanish territory. (Burr, after his term as Vice President ended in 1805, had been in contact with the Spanish, and rumors spread that Burr was perhaps seeking to form an independent republic, or to overthrow Thomas

---

[13]As an aside, the Bill of Rights as approved by the First Congress and submitted to the state legislatures for ratification had twelve—not ten—"articles." (Indeed, the version initially approved by the House of Representatives contained seventeen articles, twelve of which were approved by the Senate.) The third through twelfth of these articles became the first through tenth amendments—that is, the Bill of Rights as we know it—when they were ratified in 1791. The first article concerned congressional apportionment and was never ratified. The second article was ratified two centuries later in 1992 as the Twenty-Seventh Amendment. The remaining articles were renumbered respectively, resulting in the phenomenon that many early legal decisions refer not to the Sixth Amendment but to the "eighth article" or "eighth amendment."

[14]Notably, at least some state statutes of the Founding era use similar language for similar provisions. *See, e.g.*, S.C. Pub. Laws Act of Aug. 20, 1731, No. 552, para. XLIII ("[A]ll and every person and persons that shall be accused *and* indicted . . . shall have a true copy of the whole indictment . . . ; and in case any person or persons so accused *or* indicted, shall desire council [*sic*], the court . . . shall and is hereby authorized . . . to assign to such person and persons, such and so many council [*sic*], not exceeding 2, as the person or persons shall desire, to whom such council [*sic*] shall have free access at all seasonable times." (emphases added)).

Jefferson's administration.)**[15]** One question that arose was whether Burr was entitled to the Sixth Amendment right to compulsory service of process—a right bounded by the same modifiers as the right to counsel, insofar as it applies only to an "accused" in a "criminal prosecution." Burr had moved for a subpoena duces tecum to obtain a copy of General James Wilkinson's letter to President Jefferson accusing Burr of treason and a copy of the President's response. The prosecutor argued in opposition that Burr's right to such process did not accrue "until the grand jury shall have found a true bill." *United States v. Burr*, 25 F. Cas. 30, 32 (C.C. Va. 1807).

Chief Justice Marshall ruled that Burr was entitled to the Sixth Amendment right to compulsory service of process. *Id.* at 33 ("What can more effectually elude the right to a speedy trial than the declaration that the *accused* shall be disabled from preparing for it until an *indictment* shall be found against him?" (emphases added)).**[16]** The Chief Justice undergirded his reasoning by emphasizing that "accused" meant something entirely different than "indicted" in the Crimes Act of 1790:

> The words of the law are, "and every such person or persons accused or indicted of the crimes aforesaid, (that is, of treason or any other capital offence,) shall be allowed and admitted in his said defence to make any proof that he or they can produce by lawful witness or witnesses, and shall have the like process of the court where he or they shall be tried, to compel his or their witnesses to appear at his or their trial as is usually granted to compel witnesses to appear on the prosecution against them." This provision is made for persons accused or indicted. From the imperfection of human language, it frequently happens that sentences which ought to be the most explicit are of doubtful construction; and in this case the words "accused or indicted" may be construed to be synonymous, to describe a person in the same situation, *or to apply to different stages of the prosecution*. The word "or" may be taken in a conjunctive *or a disjunctive sense*. *A reason for understanding them in the latter sense is furnished by the section itself.* It commences with declaring that any person who shall be accused and indicted of treason shall have a copy of the indictment, and at least three days before his trial. This right is obviously to be enjoyed after an indictment, and

---

**[15]***See generally* Albert J. Beveridge, 3 *The Life of John Marshall* 274–469 (Houghton Mifflin Co. 1919); Mary K. Bonsteel Tachau, *Federal Courts in the Early Republic: Kentucky, 1789-1816*, at 127–48 (Princeton Univ. Press 1978).

**[16]**For his part, President Jefferson complied with the subpoena duces tecum issued by Chief Justice Marshall. *See United States v. Burr*, 25 F. Cas. 55, 65 (C.C. Va. 1807). And, despite its age, the *Burr* case continues to receive favorable citation. *See, e.g.*, *United States v. Hubbell*, 530 U.S. 27, 54 (2000) (Thomas, J., concurring); *Clinton v. Jones*, 520 U.S. 681, 703–04 (1997); *Franklin v. Massachusetts*, 505 U.S. 788, 826 (1992).

therefore the words are, "accused and indicted." So with respect to the subsequent clause, which authorizes a party to make his defence, and directs the court, on his application, to assign him counsel. The words relate to any person accused and indicted. But, when the section proceeds to authorize the compulsory process for witnesses, the phraseology is changed. The words are, "and every such person or persons accused or indicted," &c., *thereby adapting the expression to the situation of an accused person both before and after indictment*.

*Ibid.* (emphases added).

Chief Justice Marshall thus understood Burr to be "accused" before he was "indicted." Though Marshall addressed those terms as used in the Crimes Act, the clear implication of *Burr*'s reasoning for the Sixth Amendment was that Burr, though not yet indicted, was nonetheless an "accused" in a "criminal prosecution" for purposes of the Sixth Amendment right to compulsory process.**17** And because the right to compulsory process is constrained by the same terms as the right to counsel, it is reasonable to accord significant weight to Chief Justice Marshall's analysis in the *Burr* case as evidence of the Founding-era understanding of "accused" and "criminal prosecution" as those terms constrain the right to counsel as well.

Indeed, in the above-quoted passage from *Burr*, Chief Justice Marshall noted that under the Crimes Act of 1790, the *statutory* right of a party to apply for the court "to assign him counsel" under that Act did not accrue until the party was both "accused *and* indicted" (emphasis added). In contrast, a person's *constitutional* right under the Sixth Amendment to retain an attorney through his own efforts and receive "assistance of counsel for his defence" could accrue prior to indictment (i.e., when the person was only "accused").

Chief Justice Marshall's holding in *Burr* also recognized that a "criminal prosecution" could exist prior to an indictment. Although "[f]ederal criminal prosecutions were relatively rare

---

**17**The *Burr* "court held that a defendant's right of compulsory process attaches as soon as the defendant has an interest in preparing his defense, and that in Burr's case, this occurred upon his arrest." Jean Montoya, *A Theory of Compulsory Process Clause Discovery Rights*, 70 Ind. L. J. 845, 869 (Summer 1995); *see also* Phyllis Goldfarb, *When Judges Abandon Analogy: The Problem of Delay in Commencing Criminal Prosecutions*, 31 Wm. & Mary L. Rev. 607, 636 (Spring 1990) ("Chief Justice Marshall, the preeminent constitutional jurist of early America, rejected the notion that sixth amendment trial rights take effect only after indictment. Although he was speaking specifically of compulsory process rights, Marshall viewed the sixth amendment as protecting the preparation and presentation of a defense, such that if events preceding indictment impaired this preparation or presentation, the sixth amendment would be transgressed.").

in the early days of the Republic,"[18] Marshall, Madison, and other Founding-generation Virginians were aware of Virginia state criminal proceedings that began—prior to any indictment—with an examination of evidence by one or more magistrates, or "gentlemen justices," who were often non-lawyers, to determine whether the suspect should be committed for trial or released from custody.[19]   Virginia law provided that, if a single justice determined that the offense "ought to be examined into by the county court," a court with additional justices would then be convened—again, prior to any indictment—to "consider whether, as the case may appear to them, the prisoner may be discharged from farther [*sic*] *prosecution*, may be tried in the county, or must be tried in the general court . . . ."   An act for establishing a General Court, October 2, 1777, chap. XVII, § LVII (reprinted in William Waller Hening, The Statutes at Large, vol. IX (J. & G. Cochran 1821)) (emphasis added).[20]   From first-hand experience serving as counsel to prisoners in such examining courts,[21]   Marshall could confirm that a suspect could in fact be considered an "accused" in a "criminal prosecution," within the common meaning of those words, well before any indictment was returned.

---

[18]Roger A. Fairfax, Jr., *The Jurisdictional Heritage of the Grand Jury Clause*, 91 Minn. L. Rev. 398, 413 (2006) (citing Erwin C. Surrency, *History of the Federal Courts* 281 (2002); Adam H. Kurland, *First Principles of American Federalism and the Nature of Federal Criminal Jurisprudence*, 45 Emory L.J. 1, 57 (1996)).

[19]*See* J.A.G. Davis, *A Treatise on Criminal Law, with an Exposition of the Office and Authority of Justices of the Peace in Virginia* 110 (C. Sherman & Co. 1838) ("When an accused person has been arrested . . . and carried before a justice of the peace, the latter must then examine into the nature and grounds of the accusation; and discharge the prisoner, or else bail or commit him."); *id.* at 416 (noting that "the examination of the prisoner by the examining court, should precede his indictment; and . . . he cannot be tried upon an indictment found before such examination"); A.G. Roeber, *Faithful Magistrates and Republican Lawyers* 122 (Univ. of N.C. Press 1981) (noting that justices in many counties were known to be "not practicing lawyers").

[20]*See also Bailey's Case*, 3 Va. 258, 261 (1798) (Tucker, J.) (noting that an examining court's discharge of a prisoner examined for a particular crime bars "further prosecution" through an indictment for that crime); *Sorrell's Case*, 3 Va. 253, 255 (1786) (Tazewell, J.) (referring to the examining court's proceeding as a "criminal prosecution").

[21]In the 1780s and 1790s, prior to joining the bench, Chief Justice Marshall served as counsel representing unindicted individuals before examining courts.  *See, e.g.*, The Papers of John Marshall, vol. II, at 161–78 (Charles T. Cullen & Herbert A. Johnson eds., Univ. of N.C. Press 1977).

### 3. Other Federal Court Decisions

A few other federal court decisions shed additional light on the meaning of "accused" and "criminal prosecution." The United States Circuit Court for the Third Circuit,[22] for example, both recognized the right of a defendant to compulsory process before indictment and grappled with whether a defendant's failure to exercise that right before indictment was a failure of due diligence sufficient to forfeit the right *after* indictment. *United States v. Moore,* 26 F. Cas. 1308, 1 Wall Cir. Ct. 23 (1801). The court ruled that it was not, but it stands out that no judge appeared to question the notion that the Sixth Amendment right to compulsory process, though it extends only to an "accused" in a "criminal prosecution," extended to pre-indictment defendants.[23]

Likewise, in *Ex parte Burford*, Chief Justice Marshall, this time writing for the Supreme Court, granted a writ of habeas corpus ordering the release of a prisoner who had been jailed based only on a warrant stating that he was "not of good name and fame, nor of honest conversation, but an evil doer," and thus had an obligation to put up a $4000 surety against his inevitable bad behavior. *Ex parte Burford*, 3 Cranch (7 U.S.) 448, 450–52 (1806). The Chief Justice held that the Sixth Amendment right "to be informed of the nature and cause of the accusation" applied to the prisoner even though he had been apprehended based only on a warrant and not formally charged with any crime. *Id.* at 452. Again, Marshall interpreted the Sixth Amendment to grant rights that attached pre-indictment.

---

[22]This extinct court should not be confused with the existing United States *Court of Appeals* for the Third Circuit. The Circuit Court for the Third Circuit existed only from 1801 to 1802, and it had three judges: Chief Judge William Tilghman, Judge Richard Bassett, and Judge William Griffith.

[23]A subsequent decision of the Georgia Supreme Court confronted the same questions. *See Allen v. State*, 10 Ga. 85, 90–91 (1851) (adopting the position that "so soon as a party is charged with a crime and bound to answer, or committed for it, that it becomes then, a public prosecution, and that the indictment is but a continuation of it; and that from that stage of it he is entitled to compulsory process for his witnesses").

### *C. Applying the Evidence to Turner's Case*

To be sure, the sources cited above are not conclusive, and I do not purport to have explored all relevant sources as to when the Sixth Amendment right to counsel attaches.[24] But the Founding-era sources I have considered may be useful for future development of right-to-counsel jurisprudence even if they do not decide Turner's case. Whatever the bounds of "accused" and "criminal prosecution" may be, the Founding generation quite possibly would have understood Turner to be an "accused." And though the Framers had no understanding of modern-day charge bargaining, it takes no stretch of logic to conclude that, in Turner's case, the *prosecutor*'s presentment of an offer to enter into an agreement that would functionally *terminate* the judicial proceedings against him came *during* rather than prior to a "criminal prosecution" as those words were originally understood.[25]

Nor does the fact that charge bargaining was alien to the Framers preclude our application of their understanding of the Sixth Amendment to the modern-day charge-bargaining context. As in cases like *Jones* and *Crawford*, *see* Part I.A, *supra*, the Supreme Court routinely applies Founding-era precepts to then-unknowable modern-day scenarios. And twenty-first-

---

[24]Blackstone's Commentaries on the Law of England is intentionally omitted because in England there *was* no analogous right to counsel; in many criminal cases, especially before the Treason Act of 1695, the defendant was prohibited outright from employing counsel, and even when counsel was permitted, he could argue only points of law and not facts. *See generally* William Merritt Beaney, *Right to Counsel in American Courts* (Univ. of Mich. Press 1955). To be sure, Blackstone is a useful source of insight into eighteenth-century English legal practice, which greatly influenced the Framers' understanding of the common law. And members of the Supreme Court have on occasion looked to Blackstone in Sixth Amendment cases. *See, e.g.*, *Powell v. Alabama*, 287 U.S. 45, 60–61 (1932); *Rothgery*, 554 U.S. at 219–21 (Thomas, J., dissenting). But, as Justice Thomas recently wrote, "the Sixth Amendment was designed to abolish" rather than reify such English common-law practices as the denial of counsel in felony prosecutions. *Luis v. United States*, 136 S. Ct. 1083, 1098 (2016) (Thomas, J., concurring). And the American states resoundingly rejected the English system in their constitutions and statutes by recognizing a general right to be heard by means of counsel and without a law-versus-facts distinction. *See* Beaney, *supra*, at 29. Accordingly, I do not rely on Blackstone's Commentaries as probative evidence of the Founding-era understanding of "accused" and "criminal prosecution" as those words constrain the Sixth Amendment right to counsel.

[25]It is beyond the ambit of this opinion to determine exactly what the bounds of these words are. One might argue that the presentment of the plea offer itself made Turner an "accused" and served as an "initiation," *United States v. Gouveia*, 467 U.S. 180, 188 (1984) (citation omitted), of a "criminal prosecution." Or one might argue that the presentment of the offer was the sort of prosecutorial act that could have happened only after Turner had become an "accused" in a "criminal prosecution,"—that is, only after "the government ha[d] committed itself to prosecute [and] the adverse positions of government and defendant ha[d] solidified." *Kirby v. Illinois*, 406 U.S. 682, 690 (1972). But I reach neither of those conclusions; instead, my conclusion is simply that the analysis of Turner's claim should begin with evidence of the original meaning of these words, and that the next time a court considers the Sixth Amendment right to counsel anew, that court's analysis should likewise begin with such evidence.

century federal charge bargaining—a process for determining which crimes are to be formally charged—is analogous, for example, to the examination process under eighteenth-century Virginia law in which it was determined which crimes would or would not be allowed to proceed to trial. Thus, it makes sense to look to sources like those cited above as a starting point in analyzing Turner's right-to-counsel claim, and, should the Supreme Court wish to reconsider its right-to-counsel jurisprudence, these important and frequently overlooked sources may prove relevant to that task as well.

## III

It is difficult to imagine that any jurist today would quibble much with Turner's right to *retain* counsel in Turner's circumstances. Surely what has prompted this en banc review is not Turner's right to *retain* counsel but rather his right to *free, effective* counsel. But those rights are, the Supreme Court has told us, one and the same. *See, e.g., Martinez v. Ryan*, 566 U.S. 1, 19–20 (2012); *Frye*, 566 U.S. at 138. So, even though Turner seeks to pursue an ineffective-assistance claim, our task is the same as it would be if Turner had been without counsel altogether.

The extant historical record includes significant evidence suggesting that the Framers and their contemporaries would not deny Turner the right to retain counsel on the facts before us. That evidence is important and should not be relegated to an afterthought. Thus, because we are bound by Supreme Court decisions that do not fully engage with that evidence, I concur in today's opinion only after expressing my doubts about the precedents that bind us.

---

**CONCURRENCE IN THE JUDGMENT**

---

CLAY, Circuit Judge, concurring in the judgment only. Because *Kirby v. Illinois*, 406 U.S. 682 (1972) and *United States v. Gouveia*, 467 U.S. 180 (1984) remain governing law for the issue before the Court, I agree with the *en banc* majority that the judgment of the district court should be affirmed. I nevertheless write separately to express my reluctance in joining the judgment of the *en banc* court. The rule that we affirm today creates pernicious consequences, as persuasively articulated by the dissent. Nonetheless, I believe our hands as a Court are tied and that Supreme Court precedent prevents me from joining the dissent. I also write to express my disagreement with the *en banc* court's contention that the dual sovereignty doctrine from the double-jeopardy context applies to the Sixth Amendment right-to-counsel context.

On appeal, Turner argues that the right to counsel attached during his pre-indictment federal plea negotiations because: (i) at that time, he and the federal government were in a sufficiently adversarial posture to trigger the Sixth Amendment's protections; and, (ii) prior to the negotiations, he had already been charged in state court for the same underlying offense, and thus his right to counsel had already attached. I address each of these arguments in turn.

## I.     The Right to Counsel during Pre-Indictment Plea Negotiations

Turner argues that the right to counsel can attach during pre-indictment federal plea negotiations because those negotiations are a critical stage of the criminal process during which a defendant needs counsel in order to protect his rights against experienced professional prosecutors.

The Constitution's Sixth Amendment provides that in "all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defense." U.S. Const. amend. VI. The Supreme Court established the point at which the Sixth Amendment's right to counsel attaches in two seminal cases: *Kirby* and *Gouveia*.

In *Kirby*, the Court confronted the question of whether the right to counsel attaches after a defendant is arrested, but prior to the initiation of formal charges. *Kirby*, 406 U.S. at 686 (explaining that the Court granted certiorari to consider whether the right to counsel attaches to "preindictment confrontations" with the police and prosecutors). A plurality of the Court held "that a person's Sixth and Fourteenth Amendment right to counsel attaches only at or after the time that adversary judicial proceedings have been initiated against him." *Id.* at 688. The plurality surveyed the Court's precedents, and found that in every case where the right to counsel had been recognized, the right had attached "by way of formal charge, preliminary hearing, indictment, information, or arraignment." *Id.* at 689.

In *Gouveia*, a majority of the Court adopted the *Kirby* plurality's reasoning in full and clarified that the Sixth Amendment's right to counsel attaches only upon the formal initiation of adversarial judicial criminal proceedings. 467 U.S. at 187–89. The Court quoted the language from *Kirby*, and said, "[t]he view that the right to counsel does not attach until the initiation of adversary judicial proceedings has been confirmed by this Court in cases subsequent to *Kirby*." *Id.* at 188. The Court concluded, "given the plain language of the Amendment and its purpose of protecting the unaided layman at critical confrontations with his adversary, our conclusion that the right to counsel attaches at the initiation of adversary judicial criminal proceedings 'is far from a mere formalism.'" *Id.* at 189 (quoting *Kirby*, 406 U.S., at 689). In a concurring opinion, Justice Stevens criticized the Court for adopting a rule that "foreclose[d] the possibility that the right to counsel might under some circumstances attach prior to the formal initiation of judicial proceedings." 467 U.S. at 193 (Stevens, J., concurring).

Following *Kirby* and *Gouveia*, this Court held in *United States v. Moody*, 206 F.3d 609 (6th Cir. 2000), and then again in *Kennedy v. United States*, 756 F.3d 492 (6th Cir. 2014), that the Sixth Amendment right to counsel does not attach during pre-indictment plea negotiations. *Moody*, 206 F.3d at 612; *Kennedy*, 756 F.3d at 494. In *Moody*, we held that *Gouveia* "forecloses the possibility that the right to counsel might under some circumstances attach prior to the formal initiation of judicial proceedings." 206 F.3d at 613 (alteration omitted) (quoting *Gouveia*, 467 U.S. at 193 (Stevens, J., concurring)). Because "'the right to counsel does not attach until the initiation of adversary judicial proceedings' such as 'formal charge, preliminary hearing,

indictment, information, or arraignment,'" we reluctantly held that the Sixth Amendment right to counsel did not attach when the government offered the defendant a pre-indictment plea deal. *Id.* at 613, 615–16 (quoting *Gouveia*, 467 U.S. at 188). We said this "is a bright line test; it is a mandate that 'the Sixth Amendment right to counsel does not attach until after the initiation of formal charges.'" *Id.* at 614 (quoting *Moran v. Burbine*, 475 U.S. 412, 431 (1986)).

Writing for the panel in *Moody*, I expressed my concerns with the rule that we were required to announce:

> In light of the Supreme Court's stance on this issue, it is beyond our reach to modify this rule, even in this case where the facts so clearly demonstrate that the rights protected by the Sixth Amendment are endangered. Although [Defendant] was faced with an expert prosecutorial adversary, offering him a plea bargain which he needed legal expertise to evaluate and which would have constituted an agreement if accepted by him despite the lack of formal charges, and although by offering the specific deal the Assistant United States Attorney was committing himself to proceed with prosecution, we must uphold the narrow test of the Supreme Court. *See Hutto v. Davis*, 454 U.S. 370, 375 (1982) ("But unless we wish anarchy to prevail within the federal judicial system, a precedent of this Court must be followed by the lower federal courts no matter how misguided the judges of those courts may think it to be.").
>
> .    .    .
>
> We do not favor this bright line approach because it requires that we disregard the cold reality that faces a suspect in pre-indictment plea negotiations. There is no question in our minds that at formal plea negotiations, where a specific sentence is offered to an offender for a specific offense, the adverse positions of the government and the suspect have solidified. Indeed, it seems a triumph of the letter over the spirit of the law to hold that [Defendant] had no right to counsel in his decision to accept or deny the offered plea bargain only because the government had not yet filed formal charges. We are faced with the ponderable realization that this is an occasion when justice must of necessity yield to the rule of law, and therefore we must **REVERSE** the district court's order and reinstate the original sentence.

*Id.* at 614–16.

District Judge Wiseman's concurrence in *Moody* contained the same sentiment. He said, "the rule of law . . . requires that we follow the trail blazed by the Supreme Court. . . . I would urge the Supreme Court to reconsider its bright line test for attachment of the Sixth Amendment

right to counsel . . . ." *Id.* at 616, 618 (Wiseman, J., concurring). Judge Wiseman wrote separately to "to emphasize the pressures that the Federal Sentencing Guidelines have brought to bear on the criminal justice system and why such pressures make our rigid application of Supreme Court precedent a reluctant application." *Id.* at 616. He concluded:

> The Sixth Amendment right to counsel historically has evolved to meet the challenges presented by a changing legal paradigm. The criminal justice system has and is changing so that defendants now face critical stages of their prosecutions prior to indictment. The Sixth Amendment's underlying purpose is to protect defendants in critical stages of their prosecution. Thus, the Sixth Amendment should guarantee the right to counsel during preindictment plea negotiations. Precedent, however, prevents me from endorsing this position which logic demands.

*Id.* at 618 (internal citation omitted).

We reaffirmed *Moody* in *Kennedy*, noting that no subsequent Supreme Court case law had overruled or limited *Gouveia*'s clear holding. *Kennedy*, 756 F.3d at 493–94.

Turner argues that for decades, Courts across the country have been misinterpreting *Kirby*. Instead, Turner reasons that when *Kirby* was listing the events that could trigger the right to counsel—a formal charge, a preliminary hearing, an indictment, an information, or an arraignment—it was merely listing representative examples, and not categorically holding that the right to counsel never vests prior to the initiation of formal criminal proceedings. Rather, Turner argues that because pre-indictment plea negotiations are a critical stage of the criminal adversary process, as the Supreme Court recognized in *Missouri v. Frye*, 566 U.S. 134 (2012) and *Lafler v. Cooper*, 566 U.S. 156 (2012), the right to counsel must necessarily attach during such negotiations.

Although Turner's argument has a great deal of logical appeal, it is foreclosed by *Gouveia*. *Gouveia* held in no uncertain terms "that the right to counsel does not attach until the initiation of adversary judicial proceedings." 467 U.S. at 188. The *Gouveia* Court's holding is crystal clear, drawing a definitive line, and leaving little room for parsing or interpretation. *Gouveia* did not state or imply any exceptions to this rule and it has not been abridged, modified, or overruled by any subsequent Supreme Court cases.

While *Frye* and *Lafler* held that the right to counsel attaches during plea negotiations because such negotiations represent a "critical" stage of criminal proceedings, both of those cases involved negotiations that occurred after the defendant was formally charged. *Frye*, 566 U.S. at 138; *Lafler*, 566 U.S. at 162. The Court did not cite, much less overrule *Gouveia*, because the question of whether the right to counsel had attached at all was not at issue. Indeed, the Court has held that it is a "mistake" to merge "the attachment question (whether formal judicial proceedings have begun) with the distinct 'critical stage' question (whether counsel must be present at a postattachment proceeding unless the right to assistance is validly waived)." *Rothgery v. Gillespie Cty.*, 554 U.S. 191, 211 (2008). As the *Kennedy* panel correctly explained:

> To be sure, *Frye* and *Lafler* recognize that plea negotiations are central to the American system of criminal justice. And together the decisions make clear that the right to counsel applies in postindictment plea negotiations even if the negotiations have no effect on the fairness of a conviction. But in neither case did the Supreme Court consider the question of whether the right to counsel attached in preindictment plea negotiations.

> If anything, *Frye* and *Lafler* accept the rule that the right to counsel does not attach until the initiation of adversary judicial proceedings. Neither decision expressly abrogates or questions the rule. It would be highly unusual for the Supreme Court to discard or sharply limit a longstanding rule without comment, especially when the rule supposedly abrogated comes from the text of the Sixth Amendment. Additionally, the dissenting justices did not read the majority opinions as creating a new right to counsel in preindictment plea negotiations. And finally, recognizing that the Sixth Amendment guarantees a right to counsel at "all critical stages of [a] criminal proceeding [ ]," *Frye* explained that those critical stages include "arraignments, *postindictment* interrogations, *postindictment* lineups, and the entry of a guilty plea." *Frye*, 132 S. Ct. at 1405 (internal quotations omitted) (emphasis added). Had the Supreme Court erased the line between preindictment and postindictment proceedings for plea negotiations, it surely would have said so given its careful attention to the distinction for interrogations and lineups.

*Kennedy*, 756 F.3d at 493–94 (citations omitted).

By all rights, the right to counsel *should* attach during pre-indictment plea negotiations just as it does during post-indictment plea negotiations. But *Gouveia* is still good law that squarely stands in the way of Turner's argument. And *Moody* and *Kennedy* correctly stated and

applied that governing law.  Consequently, we are required to reject Turner's argument that the Sixth Amendment right to counsel generally attaches during pre-indictment plea negotiations.

Once again, I express the identical concerns that I did in *Moody*.  There is still no question in my mind that during pre-indictment plea negotiations where a specific sentence is offered to a suspect for a specific offense, "the adverse positions of the government and the suspect have solidified." *Moody*, 206 F.3d at 615–16.  This result remains "a triumph of the letter over the spirit of the law," but I recognize once more that "this is an occasion when justice must of necessity yield to the rule of law." *Id*. at 616.

## II.    The Right to Counsel in Joint Federal-State Prosecutions

Turner's second argument is that even if the Sixth Amendment's right to counsel does not generally attach during pre-indictment plea negotiations, it attached in this case because Turner had already been indicted in Tennessee state court for the same offense at issue in his negotiations with the federal government at the time of those negotiations, and was being prosecuted pursuant to a joint federal-state task force.  In other words, Turner argues that where, as here, a defendant is being jointly investigated and prosecuted by both state and federal authorities for the same crimes, and is indicted by one jurisdiction, the right to counsel attaches as to all charges stemming from the defendant's conduct in all jurisdictions.  Contrary to the majority opinion, I agree with Turner that when a defendant is indicted first in state court, and is later indicted for the same offense in federal court, the right to counsel attaches after the first state court indictment and covers all interactions with prosecutors related to the later federal indictment.  In this case, however, Turner is not entitled to relief because he was not prosecuted for the "same offense" in both state and federal court as that term is defined in federal law. *See Texas v. Cobb*, 532 U.S. 162, 173 (2001).

The Supreme Court has never addressed when the right to counsel attaches during joint federal-state prosecutions.  However, the Court's opinion in *Texas v. Cobb* is highly relevant. *Cobb* involved whether the Sixth Amendment right to counsel attaches as to uncharged crimes when a defendant is already in custody for a different offense.  There, the defendant was arrested for crimes stemming from a home invasion. *Cobb*, 532 U.S. at 165.  The defendant confessed to

burglarizing the home, but denied involvement in the disappearance of the home's occupants. The defendant was indicted for the burglary, and received state-appointed counsel. *Id.* Once in custody, the defendant waived his *Miranda* rights, confessed to murdering the home's occupants, and was convicted of capital murder. *Id.* at 165–66. On appeal, the defendant argued that his confession was obtained in violation of his Sixth Amendment right to counsel, which attached when he was indicted for burglary. *Id.* at 166. By contrast, the state argued that, at the time of the confession, the defendant's right to counsel had attached only as to the burglary charges, and not as to the murder charges, because the defendant had not yet been charged with murder. *See McNeil v. Wisconsin*, 501 U.S. 171, 175 (1991) (holding that the Sixth Amendment's right to counsel is "offense specific," and once invoked, does not automatically apply to all future charges.)

The Court held "that when the Sixth Amendment right to counsel attaches, it does encompass offenses that, even if not formally charged, would be considered the same offense under the" test articulated in *Blockburger v. United States*, 284 U.S. 299 (1932). *Cobb*, 532 U.S. at 173. Under *Blockburger*, "where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not." *Id.* (quoting *Blockburger*, 284 U.S. at 304). In *Cobb*, the Supreme Court concluded that the defendant's Sixth Amendment rights had not attached when he confessed to the murders because, at the time of the confession, he had only been indicted for burglary, and under Texas law, burglary and murder are separate offenses. *Id.*

Turner argues that his indictment for aggravated robbery in Tennessee encompassed the same offenses as the federal Hobbs Act robbery charges under the *Blockburger* test, and therefore, pursuant to *Cobb*, Turner's right to counsel attached after the Tennessee charges were filed. The government, by contrast, argues that Turner's analysis is incomplete. The Supreme Court explained in *Cobb* that there is "no constitutional difference between the meaning of the term 'offense' in the contexts of double jeopardy and of the right to counsel." *Id.* at 173. The government points out that in the double jeopardy context, under the "dual sovereignty doctrine," the Supreme Court has repeatedly held that federal and state crimes never constitute

"the same offense," no matter how identical the elements of the crimes are. *See, e.g.*, *Heath v. Alabama*, 474 U.S. 82, 88–89 (1985); *Abbate v. United States*, 359 U.S. 187, 194 (1959); *United States v. Lanza*, 260 U.S. 377, 382 (1922). The government therefore argues that: (i) *Cobb* implicitly imports the dual sovereignty doctrine in the Sixth Amendment's right to counsel analysis; and (ii) under the dual sovereignty doctrine, the state and federal robbery crimes charged against Turner were not "the same offenses" as a matter of law.

This Court's sister circuits are divided as to whether *Cobb* imported the dual sovereignty doctrine into the Sixth Amendment right to counsel analysis. The Second and Eighth Circuits have held that when the federal and state governments concurrently prosecute a defendant for the same offense conduct, the right to counsel attaches after the first indictment is filed, and applies to both the federal and state prosecutions. *See United States v. Mills*, 412 F.3d 325, 330 (2d Cir. 2005); *United States v. Red Bird*, 287 F.3d 709, 715 (8th Cir. 2002); *see also United States v. Coker*, 433 F.3d 39, 49 (1st Cir. 2005) (Cyr, J., dissenting in part). The First, Fourth, Fifth, and Eleventh Circuits have held that the dual sovereignty doctrine applies in the Sixth Amendment context, and that therefore when a defendant is jointly prosecuted by state and federal authorities, the right to counsel does not attach in each prosecution until after separate formal charging documents are filed. *See United States v. Burgest*, 519 F.3d 1307, 1311 (11th Cir. 2008); *United States v. Alvarado*, 440 F.3d 191, 197 (4th Cir. 2006); *Coker*, 433 F.3d at 47; *United States v. Avants*, 278 F.3d 510, 517–18 (5th Cir. 2002).

Though in the minority, the Second and Eighth Circuits have the better end of the argument. As the Second Circuit has persuasively explained in rejecting the same arguments advanced by the government here:

> Nowhere in *Cobb*, either explicitly or by imputation, is there support for a dual sovereignty exception to its holding that when the Sixth Amendment right to counsel attaches, it extends to offenses not yet charged that would be considered the same offense under *Blockburger*. *Cobb* makes clear that Sixth Amendment violations are offense specific and, consequently, evidence obtained in violation of the Sixth Amendment is not admissible in subsequent prosecutions for the "same offense" as defined by *Blockburger*. The fact that *Cobb* appropriates the *Blockburger* test, applied initially in the double jeopardy context, does not demonstrate that *Cobb* incorporates the dual sovereignty doctrine: The test is used simply to define identity of offenses. Where, as here, the same conduct supports a

federal or a state prosecution, a dual sovereignty exception would permit one sovereign to question a defendant whose right to counsel had attached, to do so in the absence of counsel and then to share the information with the other sovereign without fear of suppression. We easily conclude that *Cobb* was intended to prevent such a result.

*Mills*, 412 F.3d at 330 (footnote omitted). Equally persuasive is Judge Cyr's dissent in *Coker*, which comprehensively explains why importing the dual sovereignty doctrine into the Sixth Amendment context makes little sense and would undermine the right to counsel:

Prior to *Cobb*, there was no question but that the "separate sovereign" doctrine, pursuant to which federal and state prosecutions for the same offense were not deemed offensive to the Fifth Amendment double jeopardy clause, had no application outside the double jeopardy context. For instance, the separate sovereign doctrine neither applies to the Fourth Amendment protection from unreasonable searches and seizures, *see Elkins v. United States*, 364 U.S. 206, 208 (1960) ("[A]rticles obtained as a result of an unreasonable search and seizure by state officers, without involvement of federal officers," cannot "be introduced in evidence against a defendant over his timely objection in a federal criminal trial"), nor to the Fifth Amendment privilege against self-incrimination, *see Murphy v. Waterfront Comm'n of N.Y. Harbor*, 378 U.S. 52, 55 (1964) (stating that the policy reasons underlying the self-incrimination prohibition are "defeated when a witness can be whipsawed into incriminating himself under both state and federal law even though the constitutional privilege against self-incrimination is applicable to each"). *Elkins* and *Murphy* wisely recognized that allowing the separate sovereign doctrine to operate in the context of these important constitutional protections would encourage collusion between the federal and state sovereigns, one sovereign obtaining evidence in violation of defendants' constitutional rights, then passing the evidence on a "silver platter" to the other sovereign, which would then be free to utilize the tainted evidence in its own prosecution with no risk of suppression. *Elkins*, 364 U.S. at 208. Obviously, no comparable policy concerns regarding evidence-gathering are presented in the double jeopardy context.

Read properly, *Cobb* does not compel the anomaly which the majority now countenances, *viz.*, permitting federal and state authorities to violate a defendant's Sixth Amendment right to counsel where they are prohibited from undertaking similar collusive actions with respect to Fourth Amendment and Fifth Amendment rights. Indeed, the Sixth Amendment right to counsel has been long recognized as among the constitutional protections most critical to ensuring the conduct of fair criminal trials. *See Massiah v. United States*, 377 U.S. 201, 205 (1964); *Gideon v. Wainwright*, 372 U.S. 335, 343–44 (1963); *Johnson v. Zerbst*, 304 U.S. 458, 462–63 (1938). In *Cobb*, the federal government was *not* involved. Rather, the State indicted Cobb for burglary, later interrogated him, without the aid of counsel, concerning a murder committed during that burglary, and used his

incriminating statements during that post-indictment interview to indict him for that murder. On appeal, the question was whether the burglary and murder were the same "offense." Although some courts had devised a test which considered two crimes the same if they were factually related (*e.g.,* committed on the same day), the Court imported the *Blockburger* test from the double jeopardy definition of "offense," and held that two offenses are not the same for Sixth Amendment purposes if each requires proof of a fact that the other does not. *Cobb*, 532 U.S. at 173. It was in this straitened context that the Court stated that "[w]e see no constitutional difference between the meaning of the term 'offense' in the contexts of double jeopardy and of the right to counsel." *Id.*

Here, there is no question but that Coker was questioned after his indictment regarding the "same offense," and under *Cobb* and the *Blockburger* test, his Sixth Amendment right to counsel had attached. In order to find otherwise, one must assume that the Court held that, the particular facts of the case before it notwithstanding, it meant to decide that henceforth there would be no conceivable differences between the term "offense" in the double jeopardy and Sixth Amendment contexts. The Court in *Cobb* did not even consider the policy issues raised in *Elkins* and *Murphy*, for a simple reason: the case before it did not involve separate sovereigns.

.     .     .

Especially in light of *Elkins* and *Murphy,* and their focus upon the important policy of preventing collusive end-runs around constitutional safeguards, there remains considerable doubt whether the Court, if and when confronted with a separate sovereign case, would hold that the Sixth Amendment right to counsel should be treated less cordially than the Fourth and Fifth Amendment rights, absent some compelling reason for doing so. *See United States v. Mills,* 412 F.3d 325, 329–30 (2d Cir. 2005) (holding that *Cobb* did not intend to import separate sovereign doctrine into Sixth Amendment context); *cf. United States v. Red Bird,* 287 F.3d 709, 715 (8th Cir. 2002) (refusing to apply separate sovereign doctrine to Sixth Amendment right to counsel in joint federal-tribal crime investigation).

*Coker*, 433 F.3d at 49–51 (Cyr, J., dissenting in part).

The four circuits that import the dual sovereignty doctrine into the Sixth Amendment context all place heavy emphasis on *Cobb*'s statement that that there is "no constitutional difference between the meaning of the term 'offense' in the contexts of double jeopardy and of the right to counsel." *Cobb*, 532 U.S. at 173. But that statement is ambiguous in context; the Supreme Court was not confronted with the question of whether the dual sovereignty doctrine applies in the Sixth Amendment context, and there is no other discussion in the opinion that sheds light on the question before the *en banc* Court here. *See Coker*, 433 F.3d at 49–51 (Cyr, J.,

dissenting). And as the Second Circuit noted in *Mills*, applying the dual sovereignty doctrine under the circumstances presented by this case would lead to illogical and perverse results. By accepting the government's position, the Court allows federal authorities to speak to defendants who have been indicted in state court pursuant to a joint federal-state investigation without counsel present, and then both relay all of the information they have obtained to state prosecuting authorities and also use that information in a separate federal prosecution for the same offense conduct. In effect, the Court is sanctioning an end-run around the Sixth Amendment's right to counsel by federal-state task forces. This result surely was not envisioned when the Sixth Amendment was drafted, because until recently there was "little, if any, official coordination" between state and federal law enforcement authorities. *See* Thomas White, *Limitations Imposed on the Dual Sovereignty Doctrine by the Federal and State Governments*, 38 N. KY. L. REV. 173, 205 & n.223 (2011). The Court should not reach this dubious result absent an express and unambiguous command by the Supreme Court.

Accordingly, the *en banc* Court should have held that: (i) when a defendant is concurrently prosecuted by state and federal authorities for the "same offense," as that term is defined by *Blockburger*, the Sixth Amendment right to counsel attaches for both prosecutions whenever either state or federal authorities first file a formal judicial charging document; and (ii) the dual sovereignty doctrine is completely inapplicable in the Sixth Amendment context.

Under this analysis, the question would be whether Turner's Tennessee aggravated robbery charges and federal Hobbs Act charges were for the "same offense" under the *Blockburger* test. Under *Blockburger*, "where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not." *Cobb*, 532 U.S. at 173 (quoting *Blockburger*, 284 U.S. at 304). "In subsequent applications of the [*Blockburger*] test," the Supreme Court has "concluded that two different statutes define the 'same offense[]'" when "one is a lesser included offense of the other." *Rutledge v. United States*, 517 U.S. 292, 297 (1996) (footnote omitted); *see also Illinois v. Vitale*, 447 U.S. 410, 417, 419–20 (1980) (holding that a defendant's conviction of a lesser included offense prohibits prosecution on a greater offense, and vice-versa, because the greater and lesser

offenses are the "same offense" for double jeopardy purposes); *Brown v. Ohio*, 432 U.S. 161, 167 (1977) ("As is invariably true of a greater and lesser included offense, the lesser offense . . . requires no proof beyond that which is required for conviction of the greater . . . . The greater offense is therefore by definition the 'same' for purposes of double jeopardy as any lesser offense included in it.").

Turner argues that: (i) the elements of his conviction for Hobbs Act robbery are identical to the elements for simple robbery under Tennessee law; (ii) simple robbery is a lesser included offense of aggravated robbery; (iii) his federal Hobbs Act robbery charges were accordingly a lesser included offense of his Tennessee aggravated robbery charges; and therefore (iv) the federal and state prosecutions charged the "same offense" under the *Blockburger* test. This is tortured syllogism.

Tennessee defines aggravated robbery as follows:

(a) Aggravated robbery is robbery as defined in § 39-13-401:

> (1) Accomplished with a deadly weapon or by display of any article used or fashioned to lead the victim to reasonable believe it to be a deadly weapon; or
> (2) Where the victim suffers serious bodily injury.

TENN. CODE ANN. § 39-13-402(a). Simple robbery is defined as "the intentional or knowing theft of property from the person of another by violence or putting the person in fear." *Id.* § 39-13-401(a).

18 U.S.C. § 1951 defines Hobbs Act robbery as:

**(a)** Whoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery . . . shall be fined under this title or imprisoned not more than twenty years, or both.

**(b)** As used in this section—

> **1.** The term "robbery" means the unlawful taking or obtaining of personal property from the person or in the presence of another, against his will, by means of actual or threatened force, or violence, or fear of injury, immediate or future, to his person or property, or property in his custody or possession, or the person or property of a relative or member of his family or of anyone in his company at the time of the taking or obtaining.

Because the federal and Tennessee definitions of simple robbery are substantially the same, *compare* Tenn. Code Ann. § 39-13-401, *with* 18 U.S.C. § 1951(b)(1), the elements of these statutes can be usefully summed up for present purposes as follows: Tennessee aggravated robbery is (1) simple robbery plus (2a) the use of deadly weapon or (2b) that results in serious bodily harm, while Hobbs Act robbery is (1) simple robbery that (2) obstructs interstate commerce. As this formulation makes clear, each statute has an element that the other does not. To wit, Tennessee aggravated robbery requires either the use of a weapon or resulting great bodily harm, while Hobbs Act robbery requires neither of those things, and Hobbs Act robbery requires that the robbery have affected interstate commerce,[1] while Tennessee aggravated robbery has no such element. Therefore, (i) the two crimes are not the "same offense" under the *Blockburger* test, and (ii) under *Cobb*, Turner's Sixth Amendment right to counsel was not triggered with respect to federal authorities when he was indicted by Tennessee for aggravated robbery.

Turner's arguments to the contrary essentially ignore the interstate commerce element of Hobbs Act robbery. As recited earlier, Turner implicitly assumes that the government must only prove the elements of simple robbery in order to make out a Hobbs Act charge, and that therefore Hobbs Act robbery is essentially a lesser included offense of Tennessee aggravated robbery. But the interstate commerce element is not merely window dressing; if the government fails to prove it, the defendant is entitled to acquittal as a matter of law. *See United States v. Wang*, 222 F.3d 234, 240–41 (6th Cir. 2000) (reversing Hobbs Act robbery conviction where the government failed to prove that the robbery had more than a *de minimis* effect on interstate commerce).

Accordingly, Hobbs Act robbery is not merely a lesser version of Tennessee aggravated robbery, but a separate offense with different substantive elements. Under *Cobb*, that conclusion compels the related conclusion that Turner's right to counsel was not triggered during his pre-indictment federal plea negotiations.

---

[1]Otherwise, the Hobbs Act would not be a valid exercise of Congress's Commerce Clause powers under Article I of the Constitution.

## III.    Summary

Because the Supreme Court's opinion in *Gouveia* expressly held that Sixth Amendment rights do not attach until formal judicial adversarial proceedings are commenced and because the Supreme Court has never overruled or revised *Gouveia*, I join that part of the judgment of the *en banc* court.  This Court could not hold that the right to counsel attaches during pre-indictment plea negotiations without squarely violating the holding in *Gouveia*.

However, I disagree with the *en banc* court that the dual sovereignty doctrine from the double-jeopardy context applies to the Sixth Amendment right-to-counsel context.  When pre-indictment plea negotiations with the federal government occur after the defendant has been indicted in state court for the same offense at issue in the federal negotiations, the right to counsel protects the defendant in his interactions with the government.  But in this case, Turner had not been indicted for the "same offense" in state court as that term is used in federal law, and therefore his right to counsel had not attached during his federal pre-indictment plea negotiations.

Although today we hold otherwise, the right to counsel *should* attach during pre-indictment plea negotiations.  The current rule leads to unduly harsh consequences for criminal defendants.  It allows prosecutors to exploit uncounseled criminal defendants, and leaves counseled defendants, just like Turner, without a claim for ineffective assistance of counsel when their attorneys render deficient performance.[2]  The purpose of the Sixth Amendment right to counsel is to protect the "unaided layman at critical confrontations with his adversary." *Gouveia*, 467 U.S. at 189.  During pre-indictment plea negotiations, a defendant is confronted by "an expert [prosecutorial] adversary," "in a situation where the results of the confrontation might well settle [his] fate and reduce the trial itself to a mere formality." *Id.* (citations and internal quotation marks omitted).  During these negotiations, by offering a specific plea deal, the government has "committed itself to prosecute," solidifying "the adverse positions of

---

[2]*See* Steven J. Mulroy, *The Bright Line's Dark Side: Pre-Charge Attachment of the Sixth Amendment Right to Counsel*, 92 WASH. L. REV. 213, 213 (2017).

government and defendant." *Id*. It should not matter that in this context the defendant has yet to be formally charged or indicted.

The Supreme Court's current bright line test as set out in *Kirby* and *Gouveia* runs afoul of the purposes of the right to counsel. The rule is arbitrary and unjust. It does not account for the realities of today's criminal prosecutions and "their heavy reliance on plea bargaining"; and it requires that defendants "navigate the complex web of federal sentencing guidelines, computations that confound even those who work with them often." *Turner v. United States*, 848 F.3d 767, 773 (6th Cir.), *reh'g en banc granted, opinion vacated*, 865 F.3d 338 (6th Cir. 2017). The purposes of the right to counsel as articulated by the Supreme Court support a more flexible approach. I strongly urge the Supreme Court to reconsider this bright line test for attachment of the Sixth Amendment right to counsel.

---

**CONCURRENCE IN THE JUDGMENT**

---

HELENE N. WHITE, Circuit Judge, concurring.  I concur in the judgment only.  I also concur in Part I of Judge Clay's concurrence.  I write separately to briefly address why I conclude that *Rothgery v. Gillespie Cty.*, 554 U.S. 191 (2008), the only case relied on by the dissent that found a pre-indictment right to counsel, does not provide authority to depart from *Kirby v. Illinois*'s bright-line rule, 406 U.S. 682, 689 (1972), and apply a circumstance-specific approach to whether the right to counsel attached.

In the forty-six years since *Kirby*, every Supreme Court decision analyzing when the Sixth Amendment right to counsel attaches has adhered to the bright-line rule that a "formal charge, preliminary hearing, indictment, information, or arraignment" triggers the attachment of the right to counsel.  *Id.*  The dissent, however, argues that *Kirby* and progeny authorize, indeed require, this court to engage in a "case-by-case," "circumstance-specific inquiry," "evaluating both the relationship of the state to the accused and the potential consequences for the accused." (Dissent at 6.)

The dissent relies heavily on *Rothgery* in concluding that the Supreme Court applies a "circumstance-specific" analysis to determine whether the right to counsel has attached.  (*Id.*) But, although *Rothgery* identified the circumstance-specific facts relied on by the dissent—"if the accused is 'headed for trial and needs to get a lawyer working, whether to attempt to avoid that trial or to be ready with a defense when the trial date arrives'" or "when 'the machinery of prosecution [is] turned on,'" (*id.* at 5 (quoting *Rothgery*, 554 U.S. at 208, 210))—*Rothgery* did so in the context of applying *Kirby*'s bright-line rule to an initial arraignment, a proceeding already recognized by *Kirby* as triggering the right to counsel.  The question in *Rothgery* was whether Rothgery's initial appearance before a magistrate qualified as an "arraignment," although it preceded any prosecutorial involvement.  The Supreme Court adhered to its decisions in *Kirby*, *Brewer v. Williams*, 430 U.S. 387 (1977), and *Michigan v. Jackson*, 475 U.S. 625 (1986), all holding that an initial arraignment triggers the right to counsel, and rejected the argument that attachment of the right at the initial arraignment *also* requires that a prosecutor be aware of the

defendant's appearance before a judicial officer.  Thus, *Rothgery* simply reaffirmed *Kirby*'s bright-line rule.

Unconstrained by the Supreme Court's consistent application of *Kirby*'s bright-line rule, I would find the dissent, Judge Bush's concurrence, and Judge Clay's pertinent concluding observations persuasive on the merits.

---

**DISSENT**

---

JANE B. STRANCH, Circuit Judge, dissenting. The majority opinion declares itself bound by "four decades of circuit precedent holding that the Sixth Amendment right to counsel does not extend to preindictment plea negotiations," reciting as its basis for this rule language from the 1972 Supreme Court case, *Kirby v. Illinois*, 406 U.S. 682, 689 (1972). This reasoning misses the point of the case before us in several important ways. By elevating general language to a static rule, it disregards the Supreme Court's development across time of the law governing Sixth Amendment claims, particularly the Court's practical recognition of the changing criminal justice system and its responsive jurisprudence extending the right to counsel to events before trial. This reasoning also ignores the purpose of an en banc court—to determine whether existing circuit caselaw has failed to correctly understand or apply legal principles or Supreme Court precedent. Finally and as ably explicated by Judge Bush's historical analysis, relying on a rigid, mechanical approach closes the door to the apparent understanding of our Founders, including the authors of the Sixth Amendment, that Turner would have been recognized as an "accused."

Instead of presuming a rule-bound outcome, this case calls upon us to answer a question that the Supreme Court has not yet had the occasion to address: Does the Sixth Amendment right to counsel attach to preindictment plea negotiations when a prosecutor has presented a formal plea deal for specific forthcoming charges? The Supreme Court's Sixth Amendment precedent supports holding that such a plea offer qualifies as an adversary judicial proceeding and therefore triggers the accused's right to counsel. The failure to grapple with this precedent and engage in the requisite fact-intensive inquiry gives license to a system in which individuals are confronted with criminal charges and coerced into signing away their liberty without access to legal representation. Because I believe that the Sixth Amendment prohibits this kind of prosecutorial end run around the right to counsel, I respectfully dissent.

\*\*\*

The Supreme Court has described the Sixth Amendment right to counsel as "embod[ying] a realistic recognition of the obvious truth that the average defendant does not have the professional legal skill to protect himself when brought before a tribunal with power to take his life or liberty, wherein the prosecution is presented by experienced and learned counsel." *Johnson v. Zerbst*, 304 U.S. 458, 462–63 (1938). Over the years, the Supreme Court has incrementally extended right to counsel beyond trial itself to encompass certain pretrial proceedings. In extending the right, the Court has instructed courts to "scrutinize *any* pretrial confrontation of the accused to determine whether the presence of his counsel is necessary to preserve the defendant's basic right to a fair trial." *United States v. Wade*, 388 U.S. 218, 227 (1967) (applying the right to counsel to post-indictment lineups); *see also United States v. Ash*, 413 U.S. 300, 313 (1973) ("This review of the history and expansion of the Sixth Amendment counsel guarantee demonstrates that the test utilized by the Court has called for examination of the event in order to determine whether the accused required aid in coping with legal problems or assistance in meeting his adversary."). The Supreme Court explained that "[t]his extension of the right to counsel to events before trial has resulted from changing patterns of criminal procedure and investigation that have tended to generate pretrial events that might appropriately be considered to be parts of the trial itself." *Ash*, 413 U.S. at 310.

The Supreme Court has relied on the same type of scrutiny to determine both when the right to counsel has been triggered and when a confrontation qualifies as a "critical stage."[1] It first began to speak of this determination as "attachment" in *Kirby v. Illinois*, where it held that the right to counsel "attaches only at or after the time that adversary judicial proceedings have been initiated against" an accused. 406 U.S. 682, 688 (1972). As the majority stated, *Kirby* noted that this may happen "by way of formal charge, preliminary hearing, indictment, information, or arraignment." *Id.* at 689. But this list is only half of the story. The *Kirby* Court also set out the elements that define a proceeding for attachment purposes:

---

[1]The Supreme Court's "critical stages" cases address not at what point the right to counsel is first triggered—i.e. "attaches"—but whether the presence of counsel is necessary during a pretrial confrontation to preserve the fairness of the trial itself. *See Wade*, 388 U.S. at 227.

> The initiation of judicial criminal proceedings is far from a mere formalism. It is the starting point of our whole system of adversary criminal justice. For it is only then that the government has committed itself to prosecute, and only then that the adverse positions of government and defendant have solidified. It is then that a defendant finds himself faced with the prosecutorial forces of organized society, and immersed in the intricacies of substantive and procedural criminal law. It is this point, therefore, that marks the commencement of the "criminal prosecutions" to which alone the explicit guarantees of the Sixth Amendment are applicable.

*Id.* at 689–90. Whether adversary judicial proceedings have been initiated—and thus whether the right to counsel has attached—therefore depends on both the nature of the relationship between the government and the accused and the implications of the confrontation.

*Kirby* itself illustrates how the Supreme Court has put these principles into practice. There, police officers arrested the petitioner and a companion after finding stolen traveler's checks in their possession. *Id.* at 684. The officers immediately summoned to the police station the owner of the checks, who had reported a robbery the prior day, and he identified the petitioner and his companion. *Id.* at 684–85. The petitioner asserted that the Sixth Amendment afforded him the protection of counsel during the identification. The *Kirby* Court zeroed in on the fact that the identification at issue took place during "a routine police investigation . . . that took place long before the commencement of any prosecution whatever." *Id.* at 690. The Court also noted that other constitutional protections were in place at the investigatory stage and discussed the "constitutional balance between the right of a suspect to be protected from prejudicial procedures and the interest in society in the prompt and purposeful investigation of an unsolved crime." *Id.* at 691. Notably, the Supreme Court did not limit its analysis to the lack of an indictment, but rather engaged in a practical evaluation of the facts and circumstances. *Id.* at 689–91.

This practical evaluation is the thread that binds the Supreme Court's attachment jurisprudence. For example, the Supreme Court has emphasized the moment "when the government's role shifts from investigation to accusation. For it is only then that the assistance of one versed in the intricacies of law is needed to assure that the prosecution's case encounters the crucible of meaningful adversarial testing." *Moran v. Burbine*, 475 U.S. 412, 430 (1986) (alteration, citation, and internal quotation marks omitted) (quoting *United States v. Cronic*,

466 U.S. 648, 656 (1984)) (finding that the right had not attached during a pre-arraignment interrogation, even though the defendants' sister had already retained counsel on his behalf). In *United States v. Gouveia*, 467 U.S. 180 (1984), the Supreme Court addressed the claims of several inmates who were placed in the Administrative Detention Unit while prison officials investigated their involvement in the murders of other inmates. *Id.* at 183–84. A federal magistrate did not appoint counsel until many months later, after a federal grand jury returned indictments. *Id.* at 183. At issue was "whether the Sixth Amendment requires the appointment of counsel before indictment for indigent inmates confined in administrative detention while being investigated for criminal activities." *Id.* at 185. The Supreme Court began by clarifying the type of pretrial proceedings that touch Sixth Amendment concerns—those including confrontations with the "procedural system" or an "expert adversary," situations which "might well settle the accused's fate." *Id.* at 189 (quoting *Ash*, 413 U.S. at 310; *Wade*, 388 U.S. at 224). The Court then examined the interests that the prisoners sought to protect and found that the investigation alone did not raise "concerns implicating the right to counsel" and thus did not trigger attachment of the right. *Id.* at 191. But again, it reached this conclusion only after evaluating the circumstances, invoking *Kirby*'s caution against "mere formalism," and focusing on the "core purpose of the counsel guarantee." *Id.* at 188–89.

More recently, the Supreme Court considered whether the right to counsel had attached during a preindictment probable cause hearing with a magistrate. *Rothgery v. Gillespie Cty.*, 554 U.S. 191 (2008). Under Texas law, such hearings did not involve prosecutors and therefore, Gillespie County argued, the government had not yet committed to prosecute the case. *Id.* at 209–10. Finding the involvement of a prosecutor unnecessary for attachment purposes, the Supreme Court explained that the right to counsel applies if, "without a change of position," the accused is "headed for trial and needs to get a lawyer working, whether to attempt to avoid that trial or to be ready with a defense when the trial date arrives." *Id.* at 210; *see also id.* at 208 (holding that the attachment question is driven by when "the machinery of prosecution [is] turned on," and not by whom). In addition, the Court held that "[t]he County . . . ma[de] an analytical mistake in its assumption that attachment necessarily requires the occurrence or imminence of a critical stage." *Id.* at 212. *Rothgery* recognizes that it is not a critical stage "[w]hen a prosecutor walks over to the trial court to file an information," but implies that this

may constitute attachment. *Id. Rothgery* also rejected the County's attempt to characterize its caselaw as creating a "general rule." *Id.* at 211 ("[A]ccording to the County, our cases . . . actually establish a 'general rule that the right to counsel attaches at the point that . . . formal charges are filed' . . . . We think the County is wrong both about the clarity of our cases and the substance that we find clear."). The Supreme Court's circumstance-specific inquiry in *Rothgery* again reflects its commitment to a practical, case-by-case resolution of attachment questions.

The majority opinion concludes that the "attachment rule is crystal clear" because the right to counsel does not attach until the initiation of adversary judicial proceedings. But this conclusion begs the question because it fails to engage with what the Court means by adversary judicial proceedings. The Supreme Court has never applied a mechanical, indictment-based rule in its attachment cases. It has instead repeatedly scrutinized the confrontation, evaluating both the relationship of the state to the accused and the potential consequences for the accused. Based on this longstanding and explicit practice, it falls on us to apply the paradigm first set forth in *Kirby* and reiterated numerous times since: We must scrutinize Turner's formal federal plea offer to determine whether it marked the initiation of adversary judicial proceedings.

I think it clear that a formal plea offer on specific forthcoming charges contains all of the trappings of an adversary judicial proceeding. First and foremost, an individual who receives a formal plea offer has become an accused.[2] Prosecutors do not make plea offers to all suspects, only those who face impending charges. It would be an ethical violation for a prosecutor to make a formal plea offer if she did not intend to bring charges or if she lacked the factual or legal basis to do so. *Cf.* Am. Bar Ass'n, *Criminal Justice Standards for the Prosecution Function*, Standard 3-5.6(g) (4th ed. 2015); U.S. Dep't of Justice, *U.S. Attorneys' Manual* § 9-27.430 (2017). Thus, when a prosecutor extends a formal plea offer for specific charges, she has cemented her position as a defendant's adversary and she has committed herself to prosecute. Even if a police investigation remains ongoing, by communicating a formal and specific plea offer, the prosecutor signals that an individual has transitioned from a mere suspect to an

---

[2]I find persuasive Judge Bush's exploration of the historically broad meaning of the word "accused." His explanation of the contemporaneous understanding of the Framers and the American people supports attaching the right to counsel in this case.

accused. Formal plea offers also undoubtedly expose individuals to the intricacies of substantive and procedural law. This is precisely the sort of confrontation at which an inexperienced defendant who lacks legal skill risks signing away his liberty to a savvy and learned prosecutor.

Turner's case well illustrates this point. When the federal prosecutor communicated the plea offer to Turner's attorney, Turner already faced state robbery charges. The federal prosecutor had already committed himself to prosecute Turner—he had plans to present the federal charges to a grand jury if Turner did not accept the preindictment plea offer. Without question, that prosecutor was acting as Turner's adversary and exposing him to a minimum of more than eighty years in prison, a de facto life sentence. Turner, meanwhile, was confronted with the prosecutorial forces of organized society. To meaningfully evaluate the plea deal, Turner had to understand the charges he faced, the punishments prescribed for those charges, the defenses available to him, the strength of the case against him, and the risks of proceeding to trial. Evaluating the offer also required fluency in the complexities of the United States Sentencing Guidelines, a task that is challenging even to experienced attorneys. In sum, when scrutinizing the formal federal plea offer Turner received—as we must—I am persuaded that it marked the initiation of "adversary judicial proceedings." Turner's Sixth Amendment right to counsel had attached.

My conclusion is buttressed by the Supreme Court's analysis of post-indictment plea negotiations in *Missouri v. Frye*, 566 U.S. 134 (2012) (plurality opinion) and *Lafler v. Cooper*, 566 U.S. 156 (2012) (plurality opinion). *Frye* and *Lafler* hold that because plea negotiations might resolve an accused's fate entirely, they are critical stages encompassed by the Sixth Amendment's right to counsel. These cases had no occasion to address preindictment pleas; rather, they are critical-stage cases in which attachment was undisputed. But while criticality and attachment are distinct concepts, *see Rothgery*, 554 U.S. at 211–12, there is overlap between the factors used to analyze them, such as adversity. Thus, the logical underpinnings of *Frye* and *Lafler* reinforce the conclusion that preindictment plea negotiations contain all of the hallmarks of adversarial judicial proceedings.

In *Frye*, an attorney failed to communicate a plea offer to an individual who had been indicted on felony driving charges. 566 U.S. at 138–39. The individual later pleaded guilty

without the benefit of a plea deal and received a harsher sentence than he would have if he had accepted the offer. *Id.* at 139. On a motion for post-conviction relief, he asserted a Sixth Amendment violation, arguing that he would have accepted the first plea offer had it been properly communicated to him. *Id.* The Court considered whether post-indictment plea negotiations, which often take place absent formal court proceedings and without judicial involvement, are a critical stage. *Id.* at 140, 143–44. Citing statistics regarding the overwhelming percentage of criminal cases that are resolved through plea bargains, the Court noted:

> The reality is that plea bargains have become so central to the administration of the criminal justice system that defense counsel have responsibilities in the plea bargain process, responsibilities that must be met to render the adequate assistance of counsel that the Sixth Amendment requires in the criminal process at critical stages.

*Id.* at 143. The Court seemed persuaded by the reality that plea negotiations have functionally replaced trials, and thus are critical stages of a prosecution. *Id.* at 144. To deny counsel during plea negotiations "might deny a defendant effective representation by counsel at the only stage when legal aid and advice would help him." *Id.* (citations and internal quotation marks omitted). The Court explicitly held that, "as a general rule, defense counsel has the duty to communicate formal offers from the prosecution to accept a plea on terms and conditions that may be favorable to the accused." *Id.* at 145 (noting that the offer facing the accused was formal and had a fixed expiration date).

In *Lafler*, a companion case to *Frye*, the Court emphasized that plea negotiations are a critical stage in a case in which an individual rejected two plea offers and was subsequently convicted at trial by a jury. 566 U.S. at 161. In reiterating the holding of *Frye*, the Court focused on the underlying purpose of the Sixth Amendment, which has guided the Court's incremental application of the right to counsel. *Id.* at 165. It applied the protections to those pretrial stages of a criminal proceeding "in which defendants cannot be presumed to make critical decisions without counsel's advice." *Id.* (clarifying that the right's protections are "not designed simply to protect the trial," as evidenced by the fact that the right to counsel extends to

criminal appeals).**[3]**  In its analysis, the Supreme Court also emphasized that plea negotiations reflect deliberate state action.  *Id.* at 168 ("When a State opts to act in a field where its action has significant discretionary elements, it must nonetheless act in accord with the dictates of the Constitution." (alterations and citation omitted)).

The reasoning relied on by the Supreme Court in *Frye* and *Lafler* logically applies to preindictment plea offers, perhaps with even greater force.  When plea negotiations take place before an indictment, they may be an accused's *only* adversarial confrontation.  Denying an accused the right to counsel during preindictment plea negotiations therefore all but ensures that his window of exposure to the criminal justice system will open with the prosecutor and close in the prison system.  Evaluating a formal plea offer, which reflects deliberate state action, moreover, requires the guidance of legal counsel just as much before an indictment as after an indictment.  Accordingly, the logic animating *Lafler* and *Frye*'s conclusion that plea negotiations are a critical stage supports a determination that the right to counsel attaches when the prosecution makes a preindictment plea offer.

I find today's decision particularly concerning for two additional reasons.  First, it will leave unprotected whole hosts of defendants.  As the *Lafler* Court emphasized, "[c]riminal justice today is for the most part a system of pleas, not a system of trials."  *Lafler*, 566 U.S. at 170.  Indeed, one of our own cases made this same observation nearly two decades ago:

> Yet, the Federal Sentencing Guidelines have substantially increased the importance of preindictment plea bargaining.  In terms of percentages, the number of pleas continues to rise.  Each year since 1990 the percentage of all convictions represented by pleas of guilty or nolo contendere has increased.  In 1990, 40,452 people pleaded guilty or nolo contendere; in 1998, 56,256 people so pleaded.  These numbers represent 86.575% and 93.940% of all convictions during those respective years.  The vast majority of these pleas are the products of plea agreements.

*United States v. Moody*, 206 F.3d 609, 616–17 (6th Cir. 2000) (Wiseman, J. concurring) (citations omitted).  Judge Wiseman, a district court judge sitting by designation, also explained

---

**[3]**As the *Lafler* Court noted, the Sixth Amendment includes the right to counsel at not only critical pretrial stages, but also on appeal and at sentencing in both capital and noncapital cases.  566 U.S. at 165 (citations omitted).  These applications of the right to counsel confirm that the Supreme Court has not rigidly applied the text of the Sixth Amendment, but rather has evaluated the practical implications of the adversarial confrontation.

that the advent of the Guidelines has resulted in increased pressure on "prosecutors and defendants to engage in plea bargaining ever earlier in the criminal process.  As early as 1992 commentators noted that the Guidelines provide an incentive to engage in pre-indictment plea bargaining."  *Id.* at 617 (citations omitted).  This remains true:  At oral argument the parties and this court acknowledged the heavy reliance on preindictment plea bargaining, and the value of having counsel involved in that process.  Although we increasingly normalize and depend on preindictment plea negotiations, today's decision insulates those confrontations from the constitutional protections on which our criminal justice system ordinarily relies.  They are likewise insulated from constitutional review.  As Turner's case teaches, even those who have representation during preindictment plea negotiations are now foreclosed from bringing claims of ineffective assistance of counsel.

Second, the majority's wooden adherence to its attachment-only-on-indictment rule raises the specter of prosecutorial manipulation.  (Turner himself was offered a plea deal that exploded on indictment, betraying an effort to bypass entirely the traditional criminal process.)  If the right to counsel does not attach before indictment, prosecutors can simply delay indicting people to extract unfavorable and uncounseled plea agreements.  When 93.9% of all convictions in 1998 resulted from pleas, and that percentage apparently continues to increase, we are consigning the vast majority of citizens exposed to the American justice system to navigate the confines of an adversarial and critical plea bargaining process without legal representation.  The Sixth Amendment does not countenance giving hostages to fortune in this way.

***

The Supreme Court has expressly instructed courts to place criminal confrontations under the microscope and to apply a flexible, fact-specific analysis, but the majority opinion instead turns a blind eye to the practical realities of the situation in which Turner and multitudes of other citizens find themselves.  Turner stood accused of a crime by an experienced federal prosecutor, yet today's decision condemns him and the ever-growing number of those similarly situated to confront such accusations without the professional legal skills necessary to protect them from the unwarranted loss of their liberty.  *Zerbst*, 304 U.S. at 462–63.  I believe that this result violates the Sixth Amendment.  I therefore respectfully dissent.